HOLTZ, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 5 — February 25, 1890.*

*Murder: Conspiracy: Evidence.*

1. The evidence in this case — showing, among other things, that on the day of the homicide the defendant and others had talked about killing one B.; that they met again in the evening and had further talk on the same subject, and, after procuring guns and other weapons, proceeded together to B.'s house with the expressed purpose of killing him; that they waited near the house until B. came out, when two of the party fired upon and killed him; and that the defendant, who was armed with a club, stood near one of those who fired — is *held* to sustain a verdict of guilty of murder in the first degree.

Holtz vs. The State.

2. Evidence that some of the conspirators had left the state was admissible on behalf of the prosecution. That they were not prosecuted or present as witnesses would have been proper subject of comment by defendant's counsel.

3. For the purpose of impeachment a witness may not be asked whether she is a prostitute.

4. What was said by the other conspirators in the absence of the defendant was competent evidence against him, even if he had not then joined the conspiracy, where the same purpose was expressed after he had done so.

5. It was not error to allow a neighbor of the deceased, a witness for the defense, to be asked on cross-examination whether he had attended the funeral.

6. It being claimed that the deceased kept a house of prostitution and that the object of the party in going to the house was to take therefrom the minor daughter of one of them. the court properly refused to allow the defendant to state what he thought as to the deceased keeping a bad house.

7. Testimony as to a conversation between the father of said girl and the deceased, tending to show that the girl was there with the father's consent, and thus to contradict the father as a witness, was properly admitted.

8. A witness having been examined in chief as to certain detached parts of his testimony given on the preliminary examination, the stenographer who took down such testimony was properly allowed to testify as to what the witness then said, for the purpose of explaining apparent discrepancies.

ERROR to the Circuit Court for *Portage* County.

The case is stated in the opinion.

For the plaintiff in error there was a brief by *Cate, Jones & Sanborn*, and oral argument by *G. W. Cate.* They contended, *inter alia*, that it was proper to impeach the witness Augusta by showing that she was a prostitute. *Real v. People*, 42 N. Y. 270; *Wilber v. Flood*, 16 Mich. 40; *Foster v. People*, 18 id. 266; *Jennings v. Prentice*, 39 id. 421; 1 Greenl. Evi. (14th ed.), secs. 455, 456, 459; 1 Thomp. Trials, 459, 460. It was error to admit in evidence what was said by the conspirators in the absence of the accused, and before there was any proof of a conspiracy or that the

accused had anything to do with it if one existed. 2 Best, Evi. sec. 508; 1 Greenl. Evi. sec. 111; 4 Am. & Eng. Ency. of Law, 631–633. It was error to permit the stenographer to testify as to what the witness Sutheimer said on his preliminary examination. *People v. Keller*, 53 Cal. 65; *People v. Bell*, id. 119.

For the defendant in error there was a brief by the *Attorney General* and *L. K. Luse*, Assistant Attorney General, and a separate brief by *Geo. D. Waring*, of counsel, and *F. B. Lamoreux*, district attorney, and the cause was argued orally by the *Attorney General*, *Mr. Luse* and *Mr. Lamoreux*. To the point that proof of specific acts of immorality is not competent to impeach a witness, they cited 1 Greenl. Evi. sec. 461; *La Beau v. People*, 34 N. Y. 227, 230; *Great Western Turnp. Co. v. Loomis*, 32 id. 127. Upon the question whether the verdict was supported by the testimony, they argued that even if the crowd which went to Buelow's house had been requested by Theodore Scheider to assist him in obtaining possession of his minor daughter, the manner in which they went there indicated that they were attempting to perform a lawful act by unlawful means, and that the going there in such manner, at such time, and for such purpose, would make every person responsible for whatever offenses were committed and which might be incidental to the carrying out of their purpose. 2 Bish. Crim. Law, sec. 691; *Weston v. Comm.* 111 Pa. St. 272; *Williams v. State*, 81 Ala. 1; R. S. sec. 4511; *Reg. v. Wallis*, 1 Salk. 334; *State v. Jenkins*, 14 Rich. 215; 1 Hawk. P. C. 101, sec. 51; 2 Whart. Crim. Law, sec. 1537; 1 id. secs. 220, 396; *Queen v. McNaughten*, 14 Cox, Crim. Cas. 576; *Brennan v. People*, 15 Ill. 511; *Huling v. State*, 17 Ohio St. 589; 1 Hale's P. C. 441; 1 East's P. C. 257; *Beets v. State*, Meigs (Tenn.), 106; *Moody v. State*, 6 Coldw. (Tenn.), 305; 4 Am. & Eng. Ency. of Law, 619, 620; *Spies v. People*, 9 Crim. Law. Mag. 927, note; *S. C.* 122 Ill. 226; *State*

*v. McCahill,* 72 Iowa, 117. The testimony is sufficient to
show that at least a large number of those present who
participated in the offense went there with the intention of
killing the deceased; and the jury were warranted in find-
ing from the statement and conduct of the defendant that
he was there participating, aiding, and abetting the per-
sons who in fact caused the death. Proof of a conspiracy
might be made in the first instance without connecting the
defendant with it, and this might be done by showing the
acts and declarations of the other parties. 1 Roscoe, Crim.
Evi. sec. 571; *State v. Anderson,* 20 S. C. 581; *Confer v.
McNeal,* 74 Pa. St. 115; Whart. Evi. sec. 1205. See, also,
*Ruloff v. People,* 45 N. Y. 216; *U. S. v. Ross,* 1 Gallison,
624; *Miller v. State,* 25 Wis. 388; *State v. Crowley,* 41 id.
271; *Casper v. State,* 47 id. 535.

ORTON, J. The plaintiff in error was convicted of mur-
der in the first degree, for the killing of Albert Buelow on
the 2d day of June, 1887. The principal ground for the
reversal of the judgment is that the verdict was not war-
ranted by the testimony, and that ground will therefore be
considered first, by a brief and substantial statement of the
evidence that the jury had a right to believe. If the evi-
dence on the part of the state was sufficient to warrant the
jury in finding the defendant guilty, the verdict will not be
disturbed by this court, however it may be contradicted or
its credibility questioned, less than a full impeachment of
the witnesses by the testimony on behalf of the defendant.
The question, in such a case, must be left exclusively to the
jury. The jury that rendered the verdict, and the court
that refused to set it aside, heard the testimony of the wit-
nesses and were better able to judge of its credibility and
effect than this court can be on this mere record of it.

Albert Buelow resided in the town of Buena Vista, Port-
age county. He was divorced from his wife, and his daugh-

ter, Augusta, the divorced wife of one Theodore Scheider, kept house for him. The other members of his family, at the time, were his two sons, aged nine and twelve years, and Mary Scheider, aged about fifteen years, the daughter of said Theodore by a former wife. There was evidently a very bitter feeling against Buelow among his immediate neighbors. The said Theodore Scheider pretended that Buelow had induced his daughter Mary to become an inmate of his family for the purpose of prostitution, and made some ado about it among his friends, some of whom pretended to sympathize with him, and made it the subject of discussion, when they met, as to what ought to be done about it. Some of them suggested that Mary be taken away from Buelow's, and sent to a reform school. To meet this pretext of a provocation for conspiring together to go to the house of Buelow on the night he was killed, the state introduced testimony tending to show that Mary was not on good terms with her step-mother, the present wife of Theodore Scheider, and that she was unwilling to have Mary live at home, and drove her away, and that her father consented that she might stay with his divorced wife, Augusta, at Buelow's house, and threatened her with personal violence if she again returned home. Others of his neighbors had personal grievances of their own against Buelow, and, among them, the defendant had some trouble with him about the testimony in the divorce case of Augusta and Theodore, and Buelow was about to sue Frank Scheider, another of them, and another complained that Buelow had lied about him. But, whatever may have been the cause, one thing appears certain, and that is that the feeling of hostility against Buelow of most of those who conspired to do him harm was very bitter and intense. The evidence shows that, whatever had been previously said by any of them about going to Buelow's that night to take Mary

Scheider away, the killing of Buelow was the principal subject of their conversation. Some of them opposed it at first, but finally all seemed to agree that he should be killed, and such was at last the settled purpose of the conspiracy.

It was proper for the state to prove that there was a conspiracy formed of divers persons, and that its object or purpose was to go to his house and kill Buelow that night. But we are principally concerned about the evidence that connects the defendant with it. Every time any of them met together on that day there was much said about going to kill Buelow. Was *Charles Holtz* one of the conspirators? is our present inquiry. I shall therefore consider mainly the testimony that connects him with the murder. In the forenoon of that day, Albert Sutheimer, Julius Botton, Frank Holtz, and the defendant were working on the road. The witness Albert Sutheimer testified that it was there and then he first heard about going to Buelow's house that night. Frank Holtz and the defendant had been talking about Theodore Scheider's daughter Mary, and the defendant said: "We will go there and hang him up to-night." This was said about Buelow. In the afternoon, some others were there working on the road with them, and Buelow passed by; and Frank Holtz said: "Why didn't you knock him down?" The defendant or Theodore Scheider said: "If you want him knocked down, knock him down yourself." About 6 o'clock in the afternoon, when the men were about to quit work on the road, one Joseph Polly, the pathmaster, was present. He testified that "Frank Holtz and the defendant were talking about hanging Buelow that night," and Frank Holtz said: "We are going to take Buelow to-night. Can you go with us?" The witness said he would not, and then Frank said: "If six or seven go to hang a man, there would be nothing done about it." The

defendant was present, and heard what was said. The witness testified, further, that he heard more talk about hanging Buelow that night, in presence of the defendant.

By previous agreement, common consent, or as a strange coincidence, those six or seven conspirators met early that evening at the house of one Keliss. Some of them came first, and there was considerable conversation among them about Mary Scheider, and about killing Buelow that night, before the defendant arrived. Three of them went into the brush where they expected Buelow would come along. Frank Scheider rested his gun on the fence, and showed the others how he would shoot Buelow as he would a dog. Buelow came along, but they did not shoot. On their return, when they were about four rods from Keliss' house, Frank Holtz, one Timm, and Charles Sutheimer met them, and the defendant then came up. They were asked by some one why they did not shoot Buelow, and they were called a lot of boys. When they were all assembled, there were Herman Keliss, Frank Scheider, Theodore Scheider, Frank Holtz, *Charles Holtz*, the defendant, Julius Timm, and one Schulke, and Charles and Albert Sutheimer. Keliss and Frank Scheider had loaded guns, and Albert Sutheimer had a loaded pistol. There was then a temporary adjournment to make preparation to go to Buelow's, and to bring their guns. While they were all together at Keliss' house, much was said about killing Buelow. Four of them were armed with guns, and three of them with clubs; and the defendant, having no gun, had a club. The defendant, after he arrived, heard all that was said about going to kill Buelow, and participated with the others in making preparation for it. What was said after his arrival was a continuance or repetition of what was said before. His brother, Frank, told Albert Sutheimer " that he would have to carry a gun, and he laughed and said that he did not need a gun for that kind of a buck;" and the defendant said " that he

acted like crazy, and that Buelow might have a gun, and shoot and hit him." Then Timm and Keliss told him that he must have a gun, and he went and got one. There was a great deal of talk at Keliss' house. Some said that Buelow should be killed, and some said that he should be burned out, and some talked about Mary being at his house. But the preparations that were made were for the purpose of killing Buelow, and were suitable to that purpose.

Then they all started for the swamp, on the way to Buelow's, and there halted for the arrival of others. Some one said: "If Buelow should come along now, he would be shot." It was said that all who did not have guns should have clubs. One of them said that if they did not kill Buelow they would all be on fire to-morrow. One of the Hintz brothers, who had joined them there, said that "Buelow should be shot, and there should be no burning." Frank Scheider said: "That's right, my boy." After that there was no other purpose expressed by any one. The defendant did not dissent from this expressed purpose, but encouraged if he did not himself suggest it. When they were all assembled at the swamp, there were thirteen or fourteen of them, and at least half of them were armed, and probably all were. They again halted at the "four corners," on their way, and then took a by-path for Buelow's home, and approached it at the side or rear. They scattered themselves about the privy, five or six rods from the house. There was ploughed ground about there, and it was tramped down by their feet. It was arranged that one should go to the window of the house, to see if Buelow was in, and he went and saw him, Augusta, and Mary inside, and reported that Buelow was there. Buelow heard the dog bark, and must have heard something else, for he went outdoors, and as he was going Augusta brought to him a butcher's knife, and he said he wanted it to defend himself. When a few steps from the house, with his face

towards the privy and the men, he said: "Who in the devil is sneaking around here this time of night?" He must have seen some of the men, and they must have seen him. As soon as he spoke, he was shot in the forehead; and within a second another shot was fired, and he fell forward on his face. Both shots were fatal. Some one said: "He isn't dead! He isn't. dead!" and then the witness heard blows from clubs on his body, and Keliss came near with his gun, saying: "I loaded this for you, and I am going to give it to you," and shot into him. One shot went into the forehead, and came out the back side of the head, near the base of the skull, and the other went in near the left ear. These shots came from near the privy. The defendant stood near and a little behind the one who fired the first shot. The witness Albert Sutheimer fired his gun in the air. Nothing was said or done by any one about getting Mary away, although she was seen through the window. The defendant was seen and recognized by Augusta, standing near the privy. It was bright moonlight. Those who fired first must have recognized Buelow, for they shot him in the head. Augusta stood just behind her father when he fell. They seemed to act deliberately and in cold blood. No one made any objection or complaint, or expressed any regrets; and they went away slowly, and apparently satisfied, as if they had accomplished their purpose. They cautioned Augusta, with a threat that they would serve her the same way. They paid no attention whatever to Mary, and said nothing about her going away, but left her with Augusta.

Whether the defendant himself intended to participate in the killing of Buelow or not, he knew that some of his associates threatened to kill him and were armed with guns for that purpose; and he tacitly consented to it, went with them, and stood by them when they put their threats into execution. If they went there to do some personal

violence to Buelow, or any other unlawful act, it was suffi-
cient to make them all guilty of his murder. They stood
five or six rods away, as if to entice Buelow from his house,
and shot him dead on his first appearance, without parley
or delay. They went away, all of them, leaving Buelow
as he fell. In about thirty or forty rods away they were
all again together, and yet no regrets are expressed and no
complaints are made. One of them said they must stand
by each other, thus consummating the conspiracy. The
defendant was early in the field, and threatened to hang
Buelow that night, and advised one of them to be armed
with a gun when he expressed an indiffer⸱ ⸱e about it; and
he appeared to do as much as any one to promote the ob-
ject of the conspiracy. The testimony on behalf of the
state most fully sustains the verdict.

A criminal conspiracy is a combination of two or more
persons, by some concerted action, to accomplish some crim-
inal or unlawful purpose, or to accomplish some purpose,
not in itself criminal or unlawful, by criminal or unlawful
means. The conspirators, going armed with guns and blud-
geons, in the night-time, were clearly "criminal or unlaw-
ful means," in this case. The law of conspiracy is well
understood; and, in the light of this evidence, every one of
that crowd was unquestionably guilty of murder. *Miller
v. State*, 25 Wis. 388; *State v. Crowley*, 41 Wis. 271; *Casper
v. State*, 47 Wis. 535; 1 Rosc. Crim. Ev. (8th ed.) 571 (*429);
1 Whart. Crim. Law, § 211.

The instructions of the court to the jury on the law,
were very full, fair, and correct.

The special exceptions of the learned and eminent coun-
sel of the plaintiff in error will now be briefly considered.

(1) The admission of testimony for the state that some of
the conspirators had left the country. That they were not
prosecuted or present as witnesses would have been a proper
subject of comment by the learned counsel if their absence

had not been accounted for. *Nelson v. Harrington*, 72 Wis. 606. The learned counsel, in his brief, has seen fit to make it the subject of comment in this court. He says: "None of these persons except the defendant have been prosecuted, and none were called as witnesses for the state." He has thus furnished the proper reason for this testimony.

(2) Sustaining the objection of the district attorney to the question of the defendant's counsel, put to Augusta Miller, whether she was not a prostitute. Her general character or reputation could only be inquired of for the purpose of impeachment. *Ketchingman v. State*, 6 Wis. 432; Greenl. Ev. § 458; Whart. Crim. Ev. § 472; *La Beau v. People*, 34 N. Y. 230.

(3, 4) The admission of testimony as to what was said by some of the conspirators at Keliss' house, and at dinner at the house of Charles Sutheimer, when the defendant was not present. The reason of the objection was that the defendant had not yet joined the conspiracy, if there was one. The evidence shows that he was already one of those who were going to hang Buelow that night, and so this objection was obviated. But, if he had not yet joined the conspiracy, the same purpose was expressed after he had done so as before, so that what was said by any of them as to such purpose was proper evidence against him, especially after he did anything to further or sanction the common design. *Tucker v. Finch*, 66 Wis. 20; *Kelley v. People*, 55 N. Y. 575; 2 Whart. Crim. Law, § 1398; *Ruloff v. People*, 45 N. Y. 216.

(5) Allowing the question put to Julius Hintz, on his cross-examination, whether he attended the funeral of Buelow. It would certainly tend to impeach the witness or discredit his evidence, if he was malevolent or brutal enough to refuse to attend the funeral of his neighbor, under such circumstances.

(6) The refusal to allow the defendant, as a witness for

himself, to state what he *thought* about Buelow keeping a bad house. The object of the question, no doubt, was to prove that Buelow kept a house of prostitution, and that he (the defendant) went there to assist in getting Mary away from such a place. He had a right to state what his object was in going there. But to ask him what were his secret thoughts as to an independent and collateral fact which is susceptible of proof or disproof by positive testimony, is a violation of a primary rule of evidence. What his design, intent, or purpose was in going there is alone important; and that he would be allowed to state. What the defendant thought about it would lead to the side issue as to what he had a right to think about it, and as to whether the facts and circumstances were such as to warrant him in thinking so, and so on, as to what was the fact. When analyzed, the impropriety of the question is apparent.

(7) Permitting the stenographer who took down the testimony on the preliminary examination to testify what the witness Albert Sutheimer testified to at that examination. This testimony was admitted to rebut the apparent discrepancy between his testimony then and now. This testimony became necessary, as well as proper, because on examination in chief the witness had been examined as to certain detached parts of his testimony which could be explained only by reading it in connection with the whole testimony. This was proper, in justice to the witness, as well as in the interests of truth. 1 Rosc. Crim. Ev. 144.

(8) Allowing the witness Albert Lee to testify what Theodore Scheider said to Buelow about taking his daughter Mary away from his home, or having her leave his house. The learned counsel of the plaintiff in error, in stating the reason for his objection to this testimony, stated the very reason why it was proper, and that was that it was introduced in order to show that Mary was there with the consent of her father, and to contradict Theodore Scheider as

Holtz vs. The State.

a witness. Another reason might be added, and that is that it tended to show that the pretext of their going there in the interest of Mary was false, and that such could not have been their object. In this connection, it may be proper to say that, whatever may have been said by the defendant and others at various times about their intending to go to Buelow's to rescue Mary, the circumstances attending the whole bloody transaction show that such was neither their object, nor any part of their object, in finally going there. Keliss said, when he fired into Buelow's lifeless body: "I loaded my gun for this, and you shall have it." They all loaded their guns for this, and the defendant, with others, carried a club. or bludgeon for this. Three of them had lain in wait for him in the brush, but their courage failed them; thinking, no doubt, that their number was too small, and that if six or seven should participate in killing him nothing would be done about it, as stated by one of them before that. They lay in wait for him that night five or six rods from his house, in the shadows of the trees and privy, waiting for him to come out. They did not lay in wait for Mary, to carry her away. They ignored her entirely. But the evidence needs no further comment. There does not appear to be any error in the record.

I have availed myself of the citations of authority in the able briefs of the attorney general and district attorney, and many more authorities may be found in them, on the various assignments of error. The case was very ably tried at the circuit, and very ably presented to this court. That the plaintiff in error will suffer his just punishment cannot be attributed to any lack of ability and zeal of his eminent counsel.

*By the Court.*— The judgment of the circuit court is affirmed.

See note to this case in 44 N. W. Rep. 1108.— REP.