### Frank Mass v. The State.

No. 213.  Decided March 30, 1910.

Rehearing denied May 18, 1910.

**1.—Murder—Charge of Court—Limiting Testimony.**

Where, upon trial of murder, the evidence was not, strictly speaking, impeaching in its character but was a statement of fact which the jury were authorized to consider as evidence of guilt, there was no error in the court's failure to limit said testimony to purposes of impeachment.

**2.—Same—Charge of Court—Murder in the Second Degree.**

While it may in some cases be held that it is improper for the court to designate a homicide as murder, yet upon trial for murder where the evidence showed, by the nature of the wound and all the circumstances, that the deceased was murdered, the use of the language of the court in his charge on murder in the second degree designating the homicide as murder, there was no reversible error.

**3.——Same—Charge of Court—Alibi—Practice on Appeal.**

Where, upon trial of murder, the court charged upon the law of alibi, and the defense objection to said charge was general, and there was no special charge requested or any exception taken thereto when given, the same could not be considered on appeal. Following Jones v. State, 53 Texas Crim. Rep., 131.

**4.—Same—Charge of Court—Circumstantial Evidence—Words and Phrases— Typographical Error.**

Where, upon appeal from a conviction of murder, the appellant excepted to the court's charge on circumstantial evidence on the ground of the misspelling of a word, and it appeared from the record that the court must have used the correct word in reading his charge, and that the irregular spelling was the result of a mere typographical error, there was no error.

**5.—Same—Sufficiency of the Evidence—Death Penalty.**

See opinion for evidence, although entirely circumstantial, which is held to be sufficient to sustain the conviction of murder in the first degree assessing the death penalty.

Appeal from the District Court of Gregg.  Tried below before the Hon. W. C. Buford.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*M. L. Cunningham* and *H. H. Hanson* and *Lacy & Bramlette* and *Young & Stinchcomb,* for appellant.—On question of the insufficiency of the evidence: Southern v. State, 57 Texas Crim. Rep., 188, 122 S. W. Rep., 259; Young v. State, 47 Texas Crim. Rep., 197, 82 S. W. Rep., 1035; Hernandez v. State, 72 S. W. Rep., 840; Ellis v.

State, 29 Texas Crim. Rep., 413, 16 S. W. Rep., 256; Tollett v. State, 44 Texas, 95.

On question of the court's failure to limit testimony to purposes of impeachment: Terry v. State, 72 S. W. Rep., 382; Drake v. State, 25 Texas Crim. App., 293, 7 S. W. Rep., 868; Guinn v. State, 65 S. W. Rep., 376; Vanhouser v. State, 52 Texas Crim. Rep., 572, 108 S. W. Rep., 386; Branch v. State, 15 Texas Crim. App., 96; Exon v. State, 33 Texas Crim. Rep., 461, 26 S. W. Rep., 1088; Owens v. State, 35 Texas Crim. Rep., 345, 33 S. W. Rep., 875; Finley v. State, 47 S. W. Rep., 1015.

*John A. Mobley,* Assistant Attorney-General, and *W. R. Jones,* District Attorney, for the State.

RAMSEY, JUDGE.—The grand jury of Gregg County, on May 17, 1909, returned into the District Court thereof an indictment charging appellant with the murder of one Amanda Hunt. At a trial had in said court on May 21 thereafter he was found guilty of murder in the first degree and his punishment assessed at death.

There are no bills of exception in the record, and the only grounds of the motion which can be considered relate to criticisms of the court's charge, and to the sufficiency of the evidence to sustain the verdict.

1. The first ground of the motion attacking the charge of the court is to the effect, in substance, that the court erred in not limiting the testimony of the witness Latham, who testified, in substance, to the effect that appellant told him on the night of May 10, 1909, when questioned as to his whereabouts during the early part of the night, that he had been at home sick. This testimony, as is recited in the motion, was given by said witness after the State, on cross-examination, had asked appellant if he had not made this statement, and appellant having denied making same, this testimony was introduced as impeaching evidence, and, therefore, it is urged that the court should have limited same. This evidence was not, strictly speaking, impeaching in its character. It was the statement of a fact shown to be untrue by other evidence, which the jury were authorized to consider as evidence of guilt. Appellant had not been at home at least during any considerable part of the night in question, and by his own evidence he is shown not to have been at home. When, therefore, so soon after the disappearance of the murdered woman, we find him making untrue statements as to his whereabouts, in the nature of a fabrication of defense, this fact was admissible and pertinent to be considered by the jury on the general issue, and the court was not required to limit same.

2. The next objection to the court's charge relates to what is designated the 5th paragraph of same. In order to determine the accuracy of this instruction, reference must be had to the portion

of the charge immediately connected therewith. The court had correctly defined both murder in the first degree, and murder in the second degree, and thereupon charged the jury as follows:

"Now, if you believe from the evidence before you beyond a reasonable doubt that the defendant Frank Mass at the time and place stated in the indictment did kill Amanda Hunt by ways, instruments, means, and in a manner unknown to the grand jury, and that said killing, if any, was done with express malice, as that term has been explained to you, then in that event you will find defendant guilty of murder in the first degree and assess his punishment at death or by confinement in the penitentiary for life as you see proper."

And then followed this charge with the instruction complained of, which is as follows:

"If, however, you have a reasonable doubt of such murder being of the first degree, you will acquit him of this degree of murder and then further consider the next degree of murder, and if from the evidence you believe beyond a reasonable doubt that such murder, if any, was committed with implied malice, as that kind of malice is explained to you in this charge, you will find him guilty of murder in the second degree, and assess his punishment at confinement in the penitentiary for any term of years you see fit not less than five years."

This charge, it is urged, is erroneous, first, in that it assumes that the defendant committed the murder in question; second, in that it assumes that if the defendant did not commit murder in the first degree, he was guilty of murder of the second degree; and, third, in that it instructs the jury that if any murder was ever committed by any person the defendant was guilty of same. We do not think that, fairly construed, the charge of the court is subject to any of the objections. The jury were instructed, after defining the degrees of murder, that if they believed from the evidence beyond a reasonable doubt that appellant killed Amanda Hunt with express malice, as that term had been defined, in that event they would find him guilty of murder in the first degree. If, however, they had a reasonable doubt of such murder being in the first degree, they would acquit him of that degree of murder, and consider the next degree of murder, and that if they found beyond a reasonable doubt that the murder, if any, was committed with implied malice, that they would find him guilty of murder in the second degree. The court does not in express terms tell the jury that they are required to find that the killing was committed by appellant, in this particular paragraph, but, connected as it is with the paragraph that precedes it, it is so undeniably clear that this finding is required as to leave, we think, no possible room for doubt. It might in some cases be held that it was improper for the court to designate the homicide as being murder, but in this case, in view of the nature of the wounds, and all the circumstances, there could be no doubt at all that someone

murdered this woman, and the use of this language by the court, under the circumstances of this case, could not, we think, in the nature of things, have injured appellant.

3. Again, the charge of the court on the subject of alibi is objected to. Touching this matter the court instructed the jury as follows:

"Among the other defenses set up by defendant is what is known in legal phraseology as an alibi, that is, that if the offense was committed, that defendant was at the time of the commission thereof at another and different place from that at which such offense was committed and therefore was not and could not have been the person who committed the offense.

"Now, if the evidence raises in your mind a reasonable doubt as to the presence of the defendant at the place where the offense was committed, at the time of the commission thereof, you will find defendant not guilty."

The only objection to this charge is a general one, that it was misleading, but in another paragraph, in connection with this matter, it is claimed that the court erred in not instructing the jury affirmatively from appellant's standpoint upon the issue raised by the evidence as to defendant being at an ice factory at the time testified to by him, because, as claimed, if he was at the ice factory at the time testified to by him, he could not have committed the offense charged. We think that the charge of the court on this subject is wholly unexceptionable and not subject to the criticism made by counsel. In this connection, it may be further stated that no special charge was requested at the time, nor was any exception taken to the charge of the court when given. Jones v. State, 53 Texas Crim. Rep., 131.

4. Again, it is urged that the charge of the court on circumstantial evidence is erroneous. This charge is as follows:

"This is a case of circumstantial testimony and I now give you the law applicable to that kind of testimony. To warrant conviction upon circumstantial testimony each fact necessary to the conclusion sought to be established must be proven by competent and legal evidence beyond a reasonable doubt and all facts necessary to such conclusion must be consistent with each other and with the main fact sought to be proven and the circumstances taken together must be of a conclusive nature leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the accused and no other person committed the offense charged. It is not enough that the circumstances coincide with, account for and render probable the guilt of the accused, but they must exclude to a moral certainty every other reasonable *pyphothesis* except the defendant's guilt and unless they do so, you will find the defendant not guilty."

The first criticism is that the use of the misspelled word "pyphothe-

sis" is meaningless, unintelligible and calculated to confuse the jury,; and, further, that the charge did not instruct the jury that the facts and circumstances must exclude to a moral certainty every other reasonable hypothesis except the defendant's guilt. We confess that we do not exactly understand the objections levelled against this charge. We can not believe, further, that the mere misspelling of the word "hypothesis" could or should be held to be reversible error. No attention was called to this word by exception taken at the time, and there is among the papers an affidavit by four of the jurors that if there was a misspelled word or a miscalled word or a typographical error in the charge they failed to detect it and in no way considered it to the prejudice of appellant. We think it evident that taken in connection with what precedes and what follows it, that the court must have used the correct word in reading his charge to the jury, and that the irregular spelling as it appears in the record, was the result of a mere typographical error, and when considered altogether it can in no sense be regarded as serious.

5. The only question about which we have had any doubt is as to the sufficiency of the evidence. This has given us great concern, and we have, in the most patient and painstaking manner, more than once, carefully gone over the record to determine whether or not the evidence is sufficient to sustain the verdict. We have finally concluded that there is evidence in the record which, if believed, would have justified the jury in concluding that appellant was guilty of this foul murder, and while we would have felt the responsibility perhaps less keenly if his punishment had been assessed at confinement in the penitentiary for life, yet this, after all, was a matter for the jury, and severe as the punishment is we ought not to interfere unless we could say, on a fair review of all the testimony, that the verdict and judgment finds no support in the evidence. We shall not undertake to make a detailed statement of the case. In substance, it was shown that appellant was working at the ice factory for a Mr. Latham, and that his duties required him to work at night. He must have been a man, we judge, near middle age. He had been married, had had several children, but at some time not very clearly fixed in the evidence, had been divorced from his wife. He had been living for some years in somewhat open adultery with deceased, and there had been born to them, as the result of this relation, four children, who were generally known to be, and whom he did not hesitate to confess to be his children. He also seems, about the time of the homicide, to have maintained somewhat similar relations to another negress, one Renna Walthall, and the Walthall woman was living at his house on the night of the murder. Notwithstanding this division of his attention, he seems to have been very jealous of Amanda Hunt, and it was shown by the evidence of several witnesses that on the day of her disappearance, and before that, he had suspected her of improper intimacy with one Jim Toliver, who,

it seems, at some time not long before this, loaned her two dollars, and that he had cursed her and said he would kill her, would cut her throat, and other threats of the most horrible character, and that when she said to him, he certainly would not kill her, that he stated to her, in the presence of more than one witness, "You are going to remember these words I am telling you." Deceased was a domestic engaged in doing house work for one Melton, and on Monday night, May 10, 1909, prepared supper as usual, and left his house about seven o'clock in the afternoon of that day. She was never seen after that alive except with appellant, some two hours afterwards, as will be hereafter noted. On the Sunday following her body was found in a pond, some two or three miles from Longview, naked, with one rope around her neck and one around her body, with the rope tied to a sack which contained a rock. She was entirely nude. An examination disclosed that on her temple a place about two and one-half inches in length and one inch in width was crushed in. This, the physician says, was as serious as a wound in the heart and was undeniably fatal. He also says there was a dislocation of the cervical vertebrae. In other words, her neck was broken. The physician testifies that one of her eyes was gone, but this, he thinks, may have been due to the turtles or fish, and that worms were on many portions of her body. While it is not so stated in express terms, we think all the facts indicate beyond doubt that she must have been dead, when found, several days. Melton testified that he went by deceased's home on Tuesday morning, she not appearing at his house, and she was not at home. One witness testifies that on Tuesday appellant stopped and asked about deceased, which he had never done before, and that this inquiry was repeated on the following day. It was shown further in the evidence that on Monday morning appellant had his daughter write a brief note to George Brag, who usually worked at the ice plant in the daytime, to work for him two hours that night. It further appears he saw Brag that night at the ice plant about six o'clock. It was shown by one witness that about seven or eight o'clock that night at the house where deceased was living, that appellant was seen standing in the chimney corner. Another witness testifies that about nine o'clock appellant and deceased were on the steps of a schoolhouse, when appellant was using the most violent and harsh language towards her, and that they went from this place under the trestle on the I. & G. N. Railroad track in the general direction of the pond in question, and that at this time appellant was cursing and apparently compelling deceased to come with him. It is shown that she was a small woman. A number of persons locate appellant and deceased, near this trestle, which was in a different direction from which appellant would go from his house to where he worked. These matters are proved in great detail by the State, and need not be set out in detail here. To other persons appellant made statements that he believed they were keeping

Amanda Hunt and as to what he would do if he ascertained the fact. Appellant introduced more than one member of his family, and, among others, his son, Will Mass. This witness testifies that on the night in question he, with all the other children, went to the show, and that this was the only night that they all did go to the show, and that when they returned they saw nothing of appellant, nor did they leave him at home when they left there to go to the show. That Rennie Walthall had been back but a short time, and that about the time she returned appellant got deceased to move out, and that when she moved, the Walthall woman came. He also testifies to the fact that appellant and deceased did not get. along very well, and sometimes he would whip her. Lillie Mass, a daughter of appellant, testified, in substance, that on the Monday of the disappearance of deceased, appellant stayed in bed until about one o'clock; that before this he had not been getting up at one o'clock and going off, but usually got up at about four or five o'clock; that when he left he went down the road the other way from town towards where the pond is. She further testifies that he was dressed as he was described by other witnesses. She says further that before deceased was missing her father slept well, and that after this when he would go to sleep he would wake up and call Rennie Walthall, and that she would see her with tears in her eyes, and that she cried several times during the week; that she would go and wake him up, which she had not been doing before this occurrence happened. She says further, "Frank (meaning appellant) had the same look he always had but he acted funny, and we would hear Frank and Miss Rennie talking but we could not hear what they were saying. Frank denied terrible of killing her." She says another time she saw these parties talking, when the Walthall woman was crying, and that appellant told her that he had not killed the woman; "he said you need not be crying, you know I didn't kill her, and he said if you keep on crying you will make people believe I killed her when you know I didn't kill her, and Frank says to me, you are walking around here all drawed up like you was fixing to cry, too, and I told him I was not, that I didn't see anything to be crying for—that was the Sunday morning before he was arrested that evening." Appellant in his own testimony denies the killing, and denied the truth of some of the statements made by his other witnesses, notably by his daughter as to the direction he took on leaving the house the evening the deceased disappeared. He says that he went to see a woman, whose name he gives, to solicit carnal intercourse with her, and that not being successful in his quest, he came back to the ice plant, arriving there about nine o'clock. He also says that he went into the ice house and got some sacks and made a bed and laid down in the ice wagon and went to sleep. He did not, it seems, say anything to Bragg, whom he had secured to work for him only two hours, though he must have been very close to him. Nor did he say anything to Mr. Latham

about where he had been, except to make the untrue statement that
he had been up home sick. In other words, from about six o'clock
in the evening, except to the extent that he is identified by the State's
witnesses and shown to be uttering threats against deceased and
leaving their usual haunts with her, there is no single witness that
saw him anywhere, nor does he name or refer to any witness who
could or does satisfactorily account for his whereabouts during the
time when, under the State's testimony, he was taking this woman
away. When, therefore, we remember that from the time deceased
was seen with appellant under the trestle at the railroad about nine
o'clock at night, no mortal eye had seen her until she was found
in the pond on the following Sunday, and when to this we add the
fact that during something like three hours intervened from this
time until appellant's appearance at the ice factory, no one saw
him, nor does he give the name of any person whom he saw, and
this in a town where he had lived many years, a place with a large
negro population, and when we add to this the fact that he makes an
untrue statement of his whereabouts during this time, that he had
been at home sick, admitted by him to be untrue, proved by mem-
bers of his family to be untrue, these facts certainly must have been
considered by the jury as having great weight. It is certain, too,
that deceased was killed by someone having a strong motive so to
do. The effort to hide her body, the character of the wounds, all the
circumstances indicate deliberation, and heartless cruelty. There is
but the barest suggestion that one or two other persons named in the
record might have had motive for this murder, but it is unsubstan-
tial and inconsequential. That someone killed her is evident; that
appellant was seen with her last breathing out threats and vengeance;
that he had the motive to kill her; that he does not account for his
whereabouts during the time when she was likely murdered, but on
the contrary undertakes to fabricate a defense in respect to his where-
abouts, is disclosed by the testimony. There was some effort made on
the trial to show that appellant and deceased could not have been
seen at the trestle from the place where the witnesses testifying to
these facts placed themselves. The force of this testimony was a
matter for the jury. It is, of course, an awful responsibility, which
we could well pass by if it could be done, to affirm a judgment of
death on circumstantial evidence and yet where the jury have affirmed
by their verdict the truth of the State's contention, and registered
their judgment as to appellant's guilt, and when this conclusion of
the jury has received the approval of the learned trial court, we
ought not to interfere, unless we can say, as judges, in the light of
the entire record, that there is no evidence from which the conclusion
could fairly and justly be reached that appellant was guilty. If we
so hold, it would not only in this case mean that no one would be
punished for this foul murder, but in many cases it would mean

that out of sympathy and weakness we had declined to do our duty in enforcing the law.

Finding no error in the judgment it is ordered that the same be and is hereby in all things affirmed.

*Affirmed.*

McCord, Judge, not sitting.

[Rehearing denied May 18, 1910.—Reporter.]