Frank McCue, alias Mud McCue, v. The State.

No. 2495.   Decided December 3, 1913.

Rehearing denied February 25, 1914.

1.—Murder—Accomplice—Corroborating Testimony.

Where, upon trial of murder, there was ample testimony corroborating the accomplice, tending to connect the defendant with the crime; such as the finding of defendant's knife near the body, and many other circumstances, there was no reversible error on that ground.

2.—Same—Accomplice—Corroboration.

The contention that someone other than the accomplice must have seen defendant at or near the scene of the crime, and must have seen him strike the blow, to be sufficient as corroborative testimony, is not the law, and where the corroborating testimony was sufficient to sustain the conviction, although conflicting, there was no reversible error.

3.—Same—Alibi—Sufficiency of the Evidence—Charge of Court.

Where, upon trial of murder, the evidence presented a strong alibi, but there was positive testimony which would render the alibi untrue, the matter was a question for the jury, and the court submitting a proper charge on alibi, there was no reversible error. Following Hines v. State, 40 Texas Crim. Rep., 23, and other cases.

4.—Same—Evidence—Identification of Dead Body.

Upon trial of murder, there was no error in admitting testimony that the letters found in the grip claimed by deceased were written by the witness and her mother to the deceased, and that other wearing apparel, etc., found near the body was that of the deceased's; the identification of said body being an issue in the case. Following Campbell v. State, 8 Texas Crim. App., 84, and other cases. Davidson, Judge, dissenting.

5.—Same—Argument of Counsel—Harmless Error.

Where, upon trial of murder, the time book of the deceased found on the body of the deceased was admitted in evidence for the purpose of identifying the body, the argument of State's counsel that the deceased had been a hardworking boy, etc., which was shown by said book, should not have been permitted; however, the same was harmless error.

6.—Same—Evidence—Alibi—Rebuttal.

Where, upon trial of murder, defendant pleaded an alibi, claiming that he was at his father's home all of the time during which the offense was committed, there was no error in admitting testimony that a State's witness heard his voice in a certain place where defendant was located by other witnesses, to contradict his alibi.

7.—Same—Evidence—Reproduction of Testimony.

Upon trial of murder, there was no error in admitting testimony of a witness who had died since, showing that the defendant was at a different place than that contended for in his alibi and was seen in company with the deceased in a certain saloon, etc., on the evening of the night of the homicide. Following Robertson v. State, 63 Texas Crim. Rep., 216.

8.—Same—Evidence—Supporting Testimony.

Where, upon trial of murder, a certain State's witness testified that he saw the defendant in a different place from where he contended he was in his alibi, and the defendant undertook to impeach this witness thereto, and as to certain statements he had made that he knew nothing about the case, etc.,

. there was no error in permitting the State to introduce supporting testimony to corroborate the State's witness. Davidson, Judge, dissenting.

**9.—Same—Evidence—Weight of Testimony—Identification.**

Upon trial of murder, there was no error in admitting testimony that the witness had seen the defendant on the evening before the homicide in company with a person who suited the description of the deceased, and in a different place from that in which defendant contended he was by his alibi, and to introduce another witness for the State who testified that he was with the first State's witness and saw parties who suited the description of the defendant and the deceased, although he could not identify the defendant. Davidson, Judge, dissenting.

**10.—Same—Evidence—General Reputation.**

Where, upon trial of murder, the defendant established an alibi principally by members of his family, which was closely contested by the State's testimony, there was no error in excluding testimony offered by the defense as to the general reputation of the members of defendant's family for truth and veracity, no attack having been made on said witnesses. Following Hill v. State, 52 Texas Crim. Rep., 241, and other cases. Davidson, Judge, dissenting.

**11.—Same—Evidence—Corroborating Circumstances.**

Upon trial of murder, where the State claimed the same had been committed in the perpetration of robbery, there was no error in admitting testimony that defendant had a considerable amount of money and was spending the same with prostitutes in a saloon immediately after the homicide, and that he had no money prior thereto; the accomplice having testified to similar circumstances. Davidson, Judge, dissenting.

**12.—Same—Evidence—Supporting Testimony.**

Where, upon trial of murder, the State's testimony disclosed that the defendant and the accomplice came to a certain house of prostitution after the homicide, and that they washed their hands there and spent the remainder of the night there, there was no error in admitting testimony of the accomplice that the first time he met the defendant was at said house of prostitution and that he had seen him there frequently; this was admissible as supporting testimony, etc., of State's witnesses who were not accomplices. Davidson, Judge, dissenting.

**13.—Same—Evidence—Supporting Testimony.**

Where, upon trial of murder, the accomplice and other State's witnesses who were not accomplices had testified that defendant had been seen at a certain house of prostitution both before and immediately after the homicide, and to his various acts while there, there was no error in admitting testimony that defendant when arrested on Thursday after the homicide on Saturday night was coming from said house of prostitution and was arrested in front of the saloon thereof; besides, if error, the same was harmless. Davidson, Judge, dissenting.

**14.—Same—Charge of Court—Accomplice—Alibi—Principals.**

Where, upon trial of murder, the evidence raised the issue of accomplice testimony, alibi and principals, and the court submitted a correct charge thereon, when considered as a whole, and the evidence sustained the conviction, there was no reversible error. Davidson, Judge, dissenting.

**15.—Same—Motion for Rehearing—Argument of Counsel.**

See opinion wherein court deprecates certain expressions and animadversions of counsel in their brief and motion for rehearing.

**16.—Same—Newly Discovered Evidence—Want of Diligence.**

Where the alleged newly discovered evidence in defendant's motion for new trial showed an utter want of diligence to discover the same before the trial,

there was no error in overruling same. Following Carrico v. State, 36 Texas Crim. Rep., 618, and other cases. Davidson, Judge, dissenting.

### 17.—Same—Continuance—Cumulative Evidence.

Where the alleged newly discovered evidence was merely cumulative of testimony admitted on trial, which was the fifth trial of the case, there was no error in overruling the motion for continuance and the motion for new trial on that ground. Following Terry v. State, 3 Texas Crim. App., 236, and other cases. Distinguishing Spencer v. State, 69 Texas Crim. Rep., 92.

### 18.—Same—Identity of Deceased—Evidence.

Where one of the main issues in the trial for murder was the identification of the body of the deceased, there was no error in admitting in evidence certain letters written to the deceased, which were found near the scene of the murder in a grip which belonged to the deceased. Following Kugadt v. State, 38 Texas Crim. Rep., 681, and other cases. Davidson, Judge, dissenting.

### 19.—Same—Rule Stated—Identity.

Where the question in issue is the identity of the dead body, it is competent to show the physical characteristics. So, also, the similarity of wearing apparel and articles found on or near the remains to those known to have been in the possession of the deceased may be shown; also papers and documents in the possession of the deceased.

### 20.—Same—Supporting Testimony—Rule Stated.

Where a State's witness is sought to be impeached by showing that he has made statements with reference to the transaction out of court different from and contradictory to his testimony delivered on the trial, it is not error to allow the State to support the witness by showing that shortly after the transaction he made statements of the matter similar to his evidence delivered on the trial. Following Goode v. State, 32 Texas Crim. Rep., 505, and other cases.

### 21.—Same—Rule Stated—Supporting Testimony.

Where the testimony goes to charge the witness with recent fabrication of his testimony and that the witness testifies from corrupt motives, statements of the witness are admissible in consonance with his testimony on the trial made shortly after the happening of the event in support of his testimony. Following Williams v. State, 24 Texas Crim. App., 637, and other cases.

### 22.—Same—Evidence—Volunteer Witness.

Where, upon trial of murder, the defendant attempted to prove that certain of defendant's witnesses were volunteering as witnesses in the case, there was no error in permitting the State to show that they were called to testify by the State. Following Gonzales v. State, 16 Texas Crim. App., 152.

### 23.—Same—Argument of Counsel—Strangers.

Where the appellant complained that the argument of State's counsel that defendant's alibi was false and that, therefore, he should have been permitted to introduce supporting testimony of his alibi witnesses, but there was no attempt on the part of the State to attack the character of defendant's witnesses who testified to his alibi, there was no error in not admitting such supporting testimony; although all the witnesses, both for the State and for the defendant, were strangers in the county of the prosecution by reason of the change of venue. Davidson, Judge, dissenting.

### 24.—Same—Rule Stated—General Reputation.

The rule of law is that proof of general reputation of witnesses for truth and veracity is not admissible where no attack has been made on the witness, but there is mere conflict in the testimony offered by the State and the de-

fendant, and this although all the witnesses for the State and for the defense were strangers in the county of the prosecution by reason of the change of venue. Distinguishing Phillips v. State, 19 Texas Crim. App., 158; Harris v. State, 49 Texas Crim. Rep., 338; Goode v. State, 57 Texas Crim. Rep., 220. Davidson, Judge, dissenting.

#### 25.—Same—Evidence—Alibi—Corroborative Circumstances.

Where, upon trial of murder, the defendant pleaded an alibi and contended that he was at his father's house during the entire time, and some time before and after the homicide was committed, and that he was not in the city of Dallas proper in the afternoon preceding the murder and the night of the murder, and one of the State's witnesses testified that she heard defendant's voice in a certain house on the night of said murder, there was no error in permitting the State to introduce testimony of other State's witnesses that defendant was seen on said night of the murder in said house and that he associated there with prostitutes and freely spent money therein, etc., the State having shown that robbery was the motive of the murder and that defendant and said accomplice had been seen at said house soon after the murder with blood on their hands, etc. Davidson, Judge, dissenting.

#### 26.—Same—Evidence—Circumstances.

Where, upon trial of murder, defendant objected to certain evidence introduced by the State to the effect that he was found in a certain negro house of prostitution and was intimate with the inmates thereof, etc. Held, that while testimony that defendant had visited these places could not be shown as independent facts; yet, where they were necessarily entwined in and around the circumstances which the State legitimately offered as evidence tending to show his guilt, there was no reversible error. Davidson, Judge, dissenting.

#### 27.—Same—Charge of Court—Alibi.

Where, upon trial of murder, the defendant pleaded an alibi, and the court submitted a charge thereon according to approved precedent, there was no reversible error. Following McCoy v. State, 56 Texas Crim. Rep., 551, and other cases.

#### 28.—Same—Accomplice—Charge of Court.

Where, upon trial of murder, the conviction depended largely upon accomplice testimony and the court submitted a proper charge thereon, there was no reversible error. Following Brown v. State, 57 Texas Crim. Rep., 570, and other cases.

#### 29.—Same—Charge of Court—Requested Charges.

Where, upon trial of murder, the court submitted a correct charge on the issues raised by the evidence, which was not calculated to injure the rights of the defendant, and refused requested charges which were not the law of the case, there was no reversible error. Davidson, Judge, dissenting.

#### 30.—Same—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence sustained the conviction of murder in the first degree, although conflicting, there was no reversible error. Davidson, Judge, dissenting.

Appeal from the District Court of Collin. Tried below before the Hon. J. M. Pearson.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*Walker & Williams* and *Will Abernathy* and *Clarence Merritt* and *C. F. Greenwood,* for appellant.—On question of admitting evidence of

the contents of letters, etc., found near the body of the deceased: Thompson v. State, 38 Texas Crim. Rep., 335; Dysart v. State, 46 id., 52; Conway v. State, 33 id., 327; Stayton v. State, 32 id., 33.

On question of supporting proof by witnesses who had been impeached: Farmer v. State, 35 Texas Crim. Rep., 270; Stanford v. State, 34 id., 89; Poole v. State, 48 id., 478; Faulkner v. State, 43 id., 311.

It is error to permit the State to sustain its witnesses by proving that on a former occasion they had made statements out of court in harmony with their testimony in court, where there has been no attack made upon them as to such statements out of court: Pridemore v. State, 53 Texas Crim. Rep., 620; Red v. State, 39 id., 414; Owens v. State, 43 id., 249; St. Clair v. State, 49 id., 479; Pride v. State, 52 id., 441; Kirksey v. State, 58 id., 188; McKnight v. State, 50 id., 252; Green v. State, 110 S. W. Rep., 929.

On question that defendant had the right to introduce supporting testimony of his alibi witnesses who were strangers in the county of the prosecution: Phillips v. State, 19 Texas Crim. App., 158; Crook v. State, 27 id., 198; Tipton v. State, 30 id., 530; McGrath v. State, 35 Texas Crim. Rep., 413; Harris v. State, 49 id., 338.

On question of newly discovered evidence: Smythe v. State, 17 Texas Crim. App., 244; Bennett v. State, 30 id., 341; Taylor v. State, 27 id., 44; Baines v. State, 42 Texas Crim. Rep., 510; Thomas v. State, 51 id., 329; Rhea v. State, 67 Texas Crim. Rep., 197, 148 S. W. Rep., 578.

On question of the court's charge on principals: Hackett v. State, 13 Texas Crim. App., 406; Duncan v. State, 30 id., 1; Marshall v. State, 40 Texas, 200; Carter v. State, 37 Texas Crim. Rep., 403; Dawson v. State, 38 id., 50; Holmes v. State, 49 id., 348; Fruger v. State, 50 id., 621; Jones v. State, 57 id., 144; Clark v. State, 60 Texas Crim. Rep., 173, 131 S. W. Rep., 556.

*C. E. Lane,* Assistant Attorney General, and *L. J. Truett,* County Attorney, and *Sam Neathery,* Assistant County Attorney, for the State. —On question of admitting evidence that defendant had money and frequented a house of prostitution: Perry v. State, 69 Texas Crim. Rep., 644, 155 S. W. Rep., 263, and cases cited in opinion.

On question of harmless error in submitting such testimony: Christie v. State, 69 Texas Crim. Rep., 598, 155 S. W. Rep., 541; Bailey v. State, 69 Texas Crim. Rep., 474, 155 S. W. Rep., 536.

On question of court's charge on accomplice testimony, principals and alibi: King v. State, 57 Texas Crim. Rep., 363, 123 S. W. Rep., 135, and cases stated in opinion.

HARPER, Judge.—Appellant was prosecuted and convicted of the crime of murder in the first degree, and his punishment assessed at imprisonment in the penitentiary for life.

That the person who killed Earl Mabry on the night in question was guilty of murder in the first degree there can be no question. The question presented by this record is, was appellant one of the participants

in the crime? Roy Pringle on this trial says that appellant struck deceased in the back of the head with an iron pin, and then cut his throat with a pocketknife. Deceased had been knocked in the head, and his throat had been cut, and some seventeen other wounds had been inflicted on him. Roy Pringle was an accomplice, admitting that he stabbed deceased several times, and the court so instructed the jury. The contention that there is no testimony corroborating the accomplice, tending to connect appellant with the crime, can not be sustained. A knife was found near the dead body. Sis Hamp positively identifies this knife as the knife of appellant. This tended very strongly to connect the appellant with the crime, and is sufficient corroboration of the accomplice in and of itself to sustain the conviction. However, it may be stated that there are many other circumstances in the record corroborative of the accomplice, tending to connect the appellant with the offense. The contention that someone other than the accomplice must have seen appellant at or near the scene of the crime, and must have seen him strike the blows, to be sufficient as corroborative testimony, is not the law. If the State had such testimony, it would not need the testimony of the accomplice. When the deceased was found dead near the railroad dump, his throat cut from ear to ear, and a knife found by his side that is identified as the knife of appellant, the corroboration is sufficient. It is true that appellant assails the testimony of Roy Pringle and Sis Hamp. Witnesses swear that their reputation for truth and veracity is bad, and it is sought to impeach them by proving contradictory statements, yet all this was for the jury, and we suppose it was as ably argued in the trial of the case as it is here presented, yet the jury finds appellant guilty.

Appellant presents a strong alibi. The witnesses tie their memory to circumstances that would seem to render the defense indisputable, yet the State introduces an equal or greater number of witnesses who testify as positively to facts that would render the alibi untrue. This was a question for the determination of the jury, and the court's charge on alibi is not subject to the criticisms contained in appellant's motion for new trial, for it is drawn in language frequently approved by this court. Hines v. State, 40 Texas Crim. Rep., 23; Caldwell v. State, 28 Texas Crim. App., 566; Harris v. State, 31 Texas Crim. Rep., 411; Stevens v. State, 42 Texas Crim. Rep., 154.

On Sunday morning, the 21st day of September, 1907, the body of a young man was found on the south side of the railroad dump on the west of Texas & Pacific Railway bridge, on the road from Dallas to the cement plant, dragged into some high weeds. The skull was crushed in the back of the head; there were sixteen or seventeen knife wounds in the body, and the head had been nearly severed from the body, witnesses say only about two inches of skin at the back of the neck connected the head with the body. An iron coupling pin, bloody, was found near the body; a knife was also found, with the big blade open, the point being broken. A red leather grip was also found, and in this grip were certain letters, a time book, etc. To prove that the body was that of

Earl Mabry, the sister, who never saw the dead body, was permitted to testify that the letters found in the grip were written by herself and her mother to her brother Earl; that the writing in the time book was in her brother's hand writing; that the hat found near the dead body was her brother's hat; the watch found on the body was her brother's watch. The defendant objected to the introduction of the letters and the time book in evidence on various grounds, but as the identity of the deceased was an issue in the case, and the State was required to prove that the dead body was that of Earl Mabry, the letters and time book and other articles mentioned were admissible on the issue of identity of deceased. This question was specifically passed on in the case of Campbell v. State, 8 Texas Crim. App., 84, and the valise and contents held admissible on the question of identity of deceased. See also Wharton's Criminal Law, section 941, and cases there cited. However, it was improper for the prosecuting officer to state in his argument that the time book and certain items therein showed that the deceased was a hard working boy, and that said book showed the deceased had worked all the month of August and up to the 18th day of September, and that the book showed he had $40 in his possession. The time book was not admissible to show these facts, if it did so show, but was admissible only on the question of the identity of the deceased, and the objection to that portion of the argument of State's counsel should have been sustained. But is the error such an error as will call for a reversal of the case? The fact that deceased had on Saturday evening some $50 or $60 is amply proven by other witnesses, and there is no testimony that he did not have money on his person, so the amount of money he had was not an issue in the case. That he had, just before being killed, been at work near Mineola was amply proven by other witnesses, and that he came to Dallas Friday night was proven by defendant, by Charles Moore and Mrs. Wilky. Then, too, the issue in the case, as made by the testimony offered in behalf of appellant, was not whether the deceased had been murdered for the purpose of robbery, but that appellant was not the person who did the killing,—that he was at home at his father's Saturday and Saturday night, and could not have been the person who killed the deceased. That deceased had been foully murdered in a brutal way was shown by all the testimony adduced on the trial, and as the remarks of the prosecuting officer complained of above were not such as could or would cause the jury to find that appellant was the person who did the killing, nor had any influence in regard to that issue, the remarks do not present reversible error.

Gertrude Wilson was the twenty-sixth witness introduced by the State, and she testified: "In 1907 I remember about hearing of the dead body of a man being found over west of the Trinity river, and I heard about it Sunday evening after the killing, and the way I heard about it was by hearing them talk about it. I knew Frank McCue at that time. Oh, I hadn't known Frank McCue very long. I saw him at Beasley's several times and had heard him talk there and heard him talk at Risa Beasley's and several others, and heard him talk at Risa Beasley's

on the Saturday night before I heard of this killing the next Sunday evening. I am acquainted with Frank McCue's voice. I heard some parties talking that Saturday night upstairs in Risa Beasley's room, and I taken one of the voices to be Frank McCue's." It will be recalled that the defense of the defendant was an alibi,—that he was at home all Saturday night. When this witness was offered the defendant objected to her testimony on the following grounds:

"(1) Because the evidence that would be put before the jury and by and through the answer of said questions by said witness would be immaterial, inadmissible, irrelevant and incompetent, in that it would not establish nor tend to establish any allegation in the indictment nor any material issue in the case.

"(2) Because the testimony that would go to the jury through the medium of said witness' answers to said questions, would have only the effect to prejudice the jury against the defendant."

The court did not err in overruling the objections made, for it is manifest by the testimony of this witness if true that appellant was not at home on Saturday night, but instead was at Risa Beasley's. This evidence was on a most material issue in the case,—to prove that his alibi was not true.

The testimony of Ike Owens was reproduced. He had testified that in 1907 he worked for T. H. Moore as a bar-tender, and that at 6:30 on Saturday evening (the evening of the killing) he saw appellant, Pringle and Mabry in Moore's saloon. That the three drank together in the saloon, and appellant (McCue) said that Mabry was a stranger in the town and they were showing him around. That Mabry paid for the last round of drinks, and had fifty or sixty dollars in his purse,—that he, Owens, changed a $5 bill for him. Mr. DeBerry testified that Owens was dead,—that he saw his dead body, and attended the funeral. The court did not err in overruling the objections made. Robertson v. State, 63 Texas Crim. Rep., 216.

When the defendant had offered his testimony to prove an alibi,— that he was at his father's home in Oak Cliff all day Saturday and Saturday night, among other witnesses the State introduced Amos Clem, who testified, among other things, that on that Saturday he was in Dallas and saw appellant on Main Street in Dallas. That "at the time I was passing him, a young fellow passing by said, 'Hello, McCue, where are you going?' and the one called McCue said, 'Going over to the cement plant after a while.' The cement plant is close to Dallas and west of Dallas, and is near the Texas & Pacific Railroad, and I guess it is two or three miles from Dallas. I guess it must have been betwixt two o'clock and three o'clock when I saw the young man called McCue on Main Street, but I couldn't say positively. After that I saw him that night—that evening ten minutes before seven o'clock when he stepped off the sidewalk and went into a saloon, him and two other boys. At the time I saw him ten minutes before seven o'clock it was right north of where I first seen him across straight right north, and I seen two other boys with him and one was carrying a suit case or a grip. The

man sitting there (indicating defendant) was the one with the two boys when I saw them." This testimony was clearly admissible on the issue of appellant's alibi, and when the State had introduced this testimony, and appellant had then introduced J. C. Clem, who testified that Amos Clem had not been in Dallas that Saturday evening, it was permissible for the State to prove by other witnesses that Amos Clem was in Dallas. And when the defendant introduced J. C. Clem and proved by him that Amos Clem had told him he knew nothing about the case, but was going to testify anyway, it was permissible for the State to show by Mr. Samuels that Amos Clem had made the same statement to him one week after the homicide as that he testified to on this trial. When the defendant undertook to impeach the witness Amos Clem by evidence that he was not in Dallas on that Saturday evening, and had made statements that he knew nothing about the case, but was going to testify anyway, then Amos Clem could be supported. Branch's Crim. Law, sec. 874, and cases there cited.

Fawn Simpson testified for the State: "The day before the killing I saw Frank McCue some time after one o'clock on the corner of Elm and Crowdus Street in East Dallas, and east of the Union depot, and about four hundred yards east of the Union depot. He was sitting in Joe Harbretche's saloon at a table drinking some beer, and some fellow was with him, but I did not pay any attention to him. I did not notice how he was dressed. The fellow that was with Frank McCue had a grip setting down by his side. It was a suit case—I didn't pay any attention to it. It was similar to that grip you show me, I think. McCue and the young man were sitting at the table on my left as I went in at the front door of the saloon. They were drinking beer— that is, I took it to be beer. I just spoke to Frank as I went in—just said, 'Hello, Frank,' and he said 'Good evening.' No words passed between us. It was after one o'clock. The man that went in there with me was W. B. Fortune." This testimony was admissible, for it tended to show that appellant was not at his father's home in Oak Cliff all day Saturday as contended by him. The State then introduced W. B. Fortune, who testified that he did go in the saloon with Simpson; that two men were sitting at the table, one of whom Simpson addressed as Frank. That he did not know appellant, and could not and would not identify appellant as one of the persons sitting at the table. It was permissible for Mr. Fortune to testify that he went in this saloon, and saw two men sitting at the table, although he did not know appellant and could not identify him, when Simpson testified that he did know appellant, and appellant was one of the men he and Fortune saw sitting there. Fortune was testifying to facts within his knowledge and not to anything someone else had told him.

By his twelfth bill of exception appellant would show the following facts: "The defense of the defendant herein and his sole defense, it might be said, was an alibi. This alibi for the most part was made by the immediate members of the defendant's family, towit: his father and

mother, his brothers and sisters. The substance of defendant's alibi was that during all of the day and all of the night of the day on which and in which the offense laid in the indictment was committed, that defendant was at his home in the Oak Cliff part of the City of Dallas, Texas, and that defendant was at no time, during all of said day, and all of said night, away from his said home or outside of his father's home.

"Only two witnesses besides the members of the defendant's family testified for defendant that he was at his home on the evening of the day and immediately preceding the night on which and in which the offense laid in the indictment was committed. These two witnesses were W. A. Brown and Sam Anderson, and both of them swore that as they were passing the home of defendant at or about the hour of four o'clock on the evening immediately before the offense herein as is disclosed by the testimony in this record was committed, at about 8 o'clock that night they saw defendant at his said home and in a hammock on the porch of said home.

"Said members of defendant's family swore positively that defendant was at his home and at no time absent from or away from his said home during all of the day and all of the night of the day when the evidence shows deceased named in the indictment was killed. . . .

"All of the testimony of all the witnesses in this case, who testified as to the matter at all, shows positively that defendant's home where defendant lived at that time with his father, was fully three miles from the place where the dead body of deceased named in the indictment was found, and from the place where deceased was killed. That said home was west of the Trinity river, and fully three miles from the courthouse just east of the Trinity river in the City of Dallas, proper, and that said home was fully four miles from the Union depot in the City of Dallas proper.

"It was the contention of the State herein, stoutly argued by the State, both in the State's testimony and in the argument by counsel for the State, that defendant's defense of an alibi was false. The theory of the State in this case was that defendant was a principal in the commission of the offense laid in the indictment, and that he was actually present at the time and place of the commission of the offense, three miles distant from his home, and that he, together with the State's accomplice witness, Roy Pringle, actually participated in the commission of the offense.

"The names of defendant's family who testified in his behalf, and who swore to a complete alibi for defendant, were J. M. McCue, father of defendant; Mrs. J. M. McCue, mother of defendant; Howard McCue, brother of defendant; Miss Willie McCue, sister of defendant; John McCue, brother of defendant, and Miss Ida McCue, sister of defendant. After all of said members had testified and established by their testimony and so far as their testimony was concerned, a complete and positive alibi, the State introduced a great number of witnesses for the purpose of contradicting said members of defendant's family, and for the purpose of destroying defendant's alibi, and for the purpose of show-

ing that it was false." In the bill are named J. F. Stanley, Ashley Ewing, Will Irby, Ed Irby, Amos Clem, T. N. Briggs, A. B. McDougal, G. T. Hare, J. A. Burgess, Gertrude Wilson, Alice Meadors, Sis Hamp, B. D. James, M. Samuels, Roy Pringle, Fawn Simpson, W. B. Fortune, Ike Owens, Callie Flowers, as witnesses who testify to facts which would show that the alibi is not true, and then recites: "And be it remembered that L. J. Truett, county attorney of Collin county, who conducted the trial of this case, in his cross-examination of each and all of the herein-before named members of defendant's family, subjected each and all of them to as thorough cross-examination as he could possibly give."

After reciting all these facts appellant insists that the court erred in refusing to permit him to introduce witnesses to prove that the reputation of the father and mother of appellant and his sisters and brothers for truth and veracity was good. It is true that appellant's father and mother and other members of his family lived in Dallas County, while this case was tried in Collin County, and that the witnesses offered by appellant to prove his alibi had perhaps no acquaintance in Collin County, but as to that the record discloses that all the witnesses for the State on this issue also lived in Dallas County, and Mr. Branch in his work on Criminal Law correctly states the rule to be: "Proof of general reputation of defendant or any other witness for truth is not admissible where *no attack has been made on the witness,* but there is a mere contradiction between witnesses, or confusion in the statements of the witness," citing Hill v. State, 52 Texas Crim. Rep., 246, and many other cases in section 877 of his work. In this case in the cross-examination of the witnesses who testified to facts tending to prove an alibi for appellant, no questions were asked that would reflect upon the witnesses. Only a legitimate cross-examination was made, testing their memory, etc., and under such circumstances the court did not err in excluding the testimony as to general reputation for truth.

The most serious question in the case is the one presented by bills of exception Nos. 14, 13, 11, and 3. We will not take them up in the order numbered, but rather as they occurred on the trial. In bill No. 14 it is made to appear that while the accomplice, Roy Pringle, was testifying the State proved by him that the first time he ever met appellant was at Fannie Howard's; that he had met him there several times; that Fannie Howard ran a saloon and negro house of prostitution. In bills Nos. 11 and 13 it is shown that Officers Briggs and McDougal testified that on Tuesday after the homicide on Saturday night they saw appellant drive up to Fannie Howard's saloon and house of prostitution with two negro women in his buggy; that they all got out and appellant went in Jew Jake's saloon and invited all present to drink with him; that he rattled money in his pocket and threw a dollar down on the counter; that from the noise made he judged appellant had some twelve or fifteen dollars, and appellant remarked that everybody who refused to drink with him was a piker. In bill No. 3 it is shown by Deputy Sheriff Chick when he arrested appellant on Thursday, that

he saw him come out of an alley between Fannie Howard's saloon and her house of .prostitution, and he arrested him in front of ·Fannie Howard's door.  All this testimony was objected to on various grounds, it being unnecessary to state them all, for if the testimony was inadmissible, sufficient objection was made to it.

As to the testimony of Officers Briggs and McDougal, we think it clearly admissible.  The record discloses that just prior to the killing of young Mabry,· appellant pawned his watch to Ed Goldstein, who was in the pawn brokerage business; that appellant was, in common parlance, broke.  That Mabry had on his person some fifty or sixty dollars,. and Pringle says Mabry was killed to get his money.  Under such circumstances any testimony which would tend to show that appellant had money after Mabry's death would be admissible.  It would be a circumstance tending to show his guilt under the facts in this case in the absence of any explanation of where he got this money. · It is perhaps unfortunate for appellant, wherever he got the money, that he was spending it taking negro prostitutes driving in a buggy, and spending it in Jew Jake's saloon, treating the crowd, yet this would not render the testimony inadmissible.  The fact Mabry on the day of his death had money and appellant saw it, is shown by the testimony of Mrs. Meadors, Ike Owens and others.  That he did not have it when his body was found is shown by all the testimony.  Then the fact that appellant had no money prior to Mabry's death, and the further fact that he was well supplied with money after Mabry's death, would tend strongly to corroborate Pringle, who testified that appellant killed Mabry for his money.

As to ·the testimony of Pringle that the first time he met McCue was at Fannie Howard's house, and that he had seen him there frequently, under the evidence in this case, was admissible.  Gertrude Wilson testified that at 11 o'clock on the night of the homicide, while she did not see appellant, yet she heard him talking there at Fannie Howard's place. Sis Hamp testified that appellant and Pringle came to that house that Saturday night and that they were bloody: that they washed their hands and changed their clothing in this house of prostitution, and spent the remainder of the night in the saloon, "smoking hop," etc.  That appellant had been seen at these places and was a frequent visitor of them, would be material in passing upon whether or not Gertrude Wilson and Sis Hamp had testified to the truth, and would be admissible as supporting their testimony.  The order of its introduction would be immaterial, if upon the record as a whole it was admissible.  Appellant appreciated the strength and force of Sis Hamp's testimony and sought to break it down by a most rigid cross-examination; by evidence that her reputation for truth and veracity was bad, and by proving contradictory statements.

The other bill, that appellant when arrested on Thursday, after the homicide on Saturday night, was coming from these places and was arrested in front of the saloon, would be admissible in our opinion for the same reason.  But if we should· be wrong in these conclusions (which we do not think we are) would the fact that appellant was a frequent

visitor and often found in Fannie Howard's saloon or her house of
prostitution influence the jury in passing on his alibi? Appellant did
not testify, so it can not be said that this testimony caused the jury to
fail to give due weight to his testimony. His defense as hereinbefore
shown was an alibi, and it is not shown nor asserted that any of the
persons who testified to his alibi were ever in Fannie Howard's saloon
nor her house of prostitution, so this testimony could not affect their
credit as witnesses. It can not be said this testimony influenced or
aroused the passion of the jury, because they gave appellant the mini-
mum punishment for the offense submitted to them. As the testimony
all showed that deceased was murdered to obtain his money, only murder
in the first degree was submitted, and if the jury had given him the
death penalty, then it might be said that this testimony inflamed their
minds against appellant, but they do not assess that punishment, but
give him the least punishment the law authorized for the crime sub-
mitted to them, so evidently this testimony created no prejudice in the
minds of the jury, and as it would not and could not affect his defensive
theory and testimony, and if it did tend to support the State's evidence
and theory it would be admissible for that purpose, if error there be,
in admitting the testimony, would not call for a reversal of the case.

These are all the bills of exception in the record,—the remainder of
the motion for a new trial complains of the charge of the court. As
before stated, the court only submitted murder in the first degree, and
in so doing appellant concedes there was no error, as the element of
murder in the second degree or manslaughter are not presented by the
testimony. Many complaints are urged to the charge on accomplice tes-
timony, but these matters have been so frequently before the court we
do not deem it necessary to discuss each of them. The charge on this
issue as given is a virtual copy of the form prescribed in Campbell v.
State, 57 Texas Crim. Rep., 301, and approved in King v. State, 57
Texas Crim. Rep., 363, and other cases handed down since the rendition
of these two opinions. The criticism of the charge on alibi has hereto-
fore herein been passed upon and the cases cited, showing there was
no error in that portion of the charge. The charge on who are prin-
cipals in the commission of an offense is severely criticised, and taken
by itself it might be subjected to some criticism. But when we read the
charge as a whole, no jury could have been misled thereby. The criti-
cism that defendant's defense being an alibi, the charge on principals was
erroneous in that it did not require the jury to find that defendant was
personally present at the time of the commission of the offense, might be
said to be true by a strained construction of the language used in that
paragraph alone, yet we find that in paragraph 18 of the charge the court
instructs the jury: "Now if the evidence raises in your minds a reason-
able doubt as to the presence of the defendant at the place where the
offense was committed, at the time of the commission thereof, you will
find the defendant not guilty," so by no construction of the charge could
it be said that the jury was authorized to convict appellant, though he
was not present at the time of the commission of the offense.

This case was submitted the latter part of last June; the record is a voluminous one, and we have read and reread it, so as to arrive at the true issues in the case, and the testimony legitimately bearing on these issues. A lifetime imprisonment is assessed against appellant; the testimony supporting his plea of alibi is strong, and yet the testimony offered by the State on that issue is as equally convincing. The court in his charge was fair to appellant, and the only error in the record, as we view it, were the remarks of the county attorney in commenting on the testimony which was legitimate to prove identity, yet used by him on other issues. But as hereinbefore stated, this could not and would not affect this plea of alibi, nor support the State's theory that appellant was the person who cut Earl Mabry's throat and murdered him for his money. That it did not arouse the passion nor inflame the minds of the jury is evidenced by the verdict inflicting the minimum penalty, and we are constrained to believe that the judgment should be affirmed, and it is so ordered.

*Affirmed.*

## ON REHEARING.

### February 25, 1914.

HARPER, JUDGE.—Appellant has filed a motion for rehearing in this case, and then an amended motion, a brief and argument on the motion, and a supplemental argument, in which a number of the questions involved are ably presented, yet in some parts of the argument expressions are used that are not in accord with their high standing as lawyers, such as intimations that the court may not read the argument, and they take one expression, "The question presented by the record is, was appellant one of the participants in the crime," and while in their original brief and in the briefs and arguments filed on this motion their main insistence is that the evidence is not of that satisfactory character which would authorize the incarceration of appellant in the penitentiary for the span of his natural life, yet they take this expression and say though he was a guilty participant, yet there are other questions such as whether error was committed in receiving or excluding evidence; whether or not the court correctly instructed the jury, etc. That this is true is shown in the original opinion, for after discussing whether or not the testimony would authorize and sustain the conviction—a finding that appellant was one of the participants—we then take up and discuss each of the bills wherein it was claimed that the court erred in admitting or excluding testimony, the complaints as to the charge, etc. We always regret to see such exhibitions of temper, and strained technical criticisms of an opinion, for while it is apparent that counsel for appellant thoroughly believe in the innocence of their client, and that errors were committed in the trial, yet this court is not a partisan of the State nor the defendant, and tries to view these matters from the standpoint of what is right and just, and administer the law whether it results in an affirmance or reversal. But it is sometimes insisted that we too often

hold that while some slight error has crept into the record against the voluminous one, and we have read and reread it, so as to arrive at the case, and these technical matters are never held against the State. Counsel in their zeal forget that we never have an opportunity to so hold. The State has no right of appeal, and no matter how erroneous a ruling of the trial court may be against the State in regard to admitting or rejecting testimony, the State can not bring those questions to us for review. On appeal all we pass on is, was there error committed against the defendant on the trial of the case, and if so was it of that nature to harmfully affect him? If the State could bring its side of the question up for review also, doubtless there would be as many holdings that some slight error was committed as against the prosecution, but that it was harmless error. As hereinbefore stated, counsel in their zeal forget that only a defendant can appeal, and this court can and only does pass on whether or not there has been error committed against him—has he or not had a fair and impartial trial. We have been led to make these suggestions or remarks by the ill-timed expressions contained in the arguments on file, and we are satisfied that counsel, when they coolly reflect on the matter themselves, will admit that the use of the remarks and expressions were wholly unwarranted and out of place.

Counsel complain very bitterly that we did not pass on every question raised in the voluminous record, containing more than four hundred pages of typewritten matter, besides the lengthy brief and arguments on file, and seem to think we did not consider them, for if we had, such matters would present reversible error. One we did not pass on was the question of request for a new trial on account of newly discovered evidence. This had so often been decided adversely to appellant's contention we did not deem it necessary, or think he seriously relied on it. However, we will state this was the fifth trial of appellant, and yet after his conviction he filed a motion setting up newly discovered evidence, that of Geo. T. Garvin and Ed Carlton, who say they would swear to facts tending to support appellant's plea of alibi. Mr. Garvin says he did not tell McCue nor his family, nor his attorney about the facts he would testify to, but that he "had, however, many times mentioned the fact to persons in Dallas with whom he was talking." So it can be readily seen as to this witness, during the five years this case was pending, the slightest diligence would have discovered this testimony, for he says he had many times mentioned the matter to persons with whom he was talking. Mr. Carlton says that at the time he would testify to seeing appellant, he spoke to appellant and appellant replied. So it is seen that appellant all the time was as well aware that he saw Carlton as Carlton was that he saw appellant. So under no rule of law would this testimony come within the rules of what is termed newly discovered testimony. Carrico v. State, 36 Texas Crim. Rep., 618; Reagan v. State, 28 Texas Crim. App., 227; McVey v. State, 23 Texas Crim. App., 659; Robinson v. State, 15 Texas, 311; Brown v. State, 16 Texas, 123, and almost an innumerable list of authorities cited under subdivisions 3 and 4 of sec. 1169, White's Ann. Proc.

Again it is shown that this is the fifth trial of the case, and several continuances had. Eight witnesses testified to an alibi for defendant on the trial, some of whom were related, but two of them were in no way related to him. The testimony of Messrs. Garvin and Carlton would be but cumulative of the testimony of these witnesses. Appellant cites us to the case of Thomas v. State, 101 S. W. Rep., 797, 51 Texas Crim. Rep., 329, wherein it was held: "In a prosecution for theft from the person, an application of the accused for a continuance, in order to obtain the testimony of an absent witness to the effect that accused was at another place at the time the crime was committed, should have been granted, where diligence to obtain the testimony was shown." In the opinion it is said this was the *first application for a continuance,* and it has always been the rule of law in this State that doctrine of cumulative testimony does not apply to the first application for a continuance, and in addition to the authorities cited by appellant, hundreds of others could have been cited. The other cases cited by appellant on this question are: Pinckord v. State, 13 Texas Crim. App., 468; Baines v. State, 42 Texas Crim. Rep., 510; Smythe v. State, 17 Texas Crim. App., 244, and in none of them was the court passing on a second or subsequent application, and in all of them diligence had been shown, and in none of them is the rule as stated by appellant sustained. In this case there is a total lack of diligence; as hereinbefore shown it was not the first application, but this application comes after the fifth trial of the case.

Now what is the rule of law in this State on the second or any application other than the first application? It is "that a new trial will not be granted in a criminal case for newly discovered testimony which is merely cumulative," and this is supported in all the following decisions: Shaw v. State, 27 Texas, 750; Kemp v. State, 38 Texas, 110; Henderson v. State, 1 Texas Crim. App., 432; Terry v. State, 3 Texas Crim. App., 236; Duval v. State, 8 Texas Crim. App., 370; Garner v. State, 34 Texas Crim. Rep., 356, 30 S. W. Rep., 782; Granger v. State, 31 S. W. Rep., 671; Washington v. State, 35 Texas Crim. Rep., 154, 32 S. W. Rep., 693; Porter v. State, 32 S. W. Rep., 695; Scruggs v. State, 35 Texas Crim. Rep., 622, 34 S. W. Rep., 951; Little v. State, 35 S. W. Rep., 659; Price v. State, 36 Texas Crim. Rep., 403, 37 S. W. Rep., 743; Turner v. State, 37 Texas Crim. Rep., 451, 36 S. W. Rep., 87, 40 S. W. Rep., 980; Simnacher v. State, 43 S. W. Rep., 512; Adler v. State, 50 S. W. Rep., 358; Gass v. State, 56 S. W. Rep., 73; John v. State, 58 S. W. Rep., 105; Thompson v. State, 45 Texas Crim. Rep., 244, 76 S. W. Rep., 561; Duncan v. State, 77 S. W. Rep., 13; Mathews v. State, 77 S. W. Rep., 218; Hanna v. State, 48 Texas Crim. Rep., 269, 87 S. W. Rep., 702; Taylor v. State, 87 S. W. Rep., 1039; Owens v. State, 89 S. W. Rep., 837; Goen v. State, 101 S. W. Rep., 232; Coffman v. State, 51 Texas Crim. Rep., 478, 103 S. W. Rep., 1128; Harrolson v. State, 54 Texas Crim. Rep., 452, 113 S. W. Rep., 544; Roberts v. State, 57 Texas Crim. Rep., 199, 122 S. W. Rep., 388; Reagan v. State, 57 Texas Crim. Rep., 642, 124 S. W. Rep., 685; Garza v. State, 65 Texas Crim. Rep., 476, 145 S. W. Rep., 590; Hogan v. State, 66 Texas Crim. Rep.,

498, 147 S. W. Rep., 871. And this rule is the rule also in other States: Douglass v. State, 91 Ark., 492; High v. State, 12 Ariz., 146; People v. McDonell, 47 Cal., 134; Leggett v. People, 26 Colo., 364; Long v. State, 42 Fla., 612; Watson v. State, 118 Ga., 83; People v. Biles, 2 Idaho, 114; People v. Hayer, 249 Ill., 603; Ludwig v. State, 170 Ind., 648; State v. Blain, 118 Iowa, 466; State v. Nimerick, 74 Kan., 658; Lawson v. Com., 152 Ky., 113; State v. Turner, 122 La., 371; People v. Quinly, 134 Mich., 625; State v. Sherber, 111 Minn., 138; Newcomb v. State, 37 Miss., 383; State v. King, 194 Mo., 474; Hamblin v. State, 81 Neb., 148; Territory v. Yarberry, 2 New Mex., 391; Williams v. People, 145 Barb. (N. Y.), 201; State v. Lilliston, 141 N. C., 857; State v. Brandner, 21 N. Dak., 310; Loeffer v. State, 10 Ohio, 598; Harvey v. State, 11 Okla., 156; State v. Oregon, 39 Ore., 90; Com. v. Hine, 213 Pa., 97; State v. Henderson, 49 S. C., 330; State v. Raice, 24 S. Dak., 111; King v. State, 91 Tenn., 617; People v. Peacock, 5 Utah, 237; May v. State, 77 Vt., 330; Baccigalupo v. Com., 33 Grat. (Va.), 807; State v. Beeman, 51 Wash., 557; Bales v. State, 3 W. Va., 685; Passo v. State, 19 Wyo., 344; Canada Ry. v. McIlroy, 15 U. C. C. P., 116.

In the majority of these States they apply the rule of no new trial on account of testimony that is merely cumulative even to the first application, but our court has adopted the most liberal rule on the first application where diligence is shown, but adheres to the rule on the second or subsequent application. In the case of Spencer v. State, 69 Texas Crim. Rep., 92, 153 S. W. Rep., 858, this court, in an opinion by the writer, held that where the testimony was about on an equipoise, and the defensive matter was testified to by a brother of the defendant alone, and the testimony really came within the rule as to newly discovered testimony and was cogent, we would grant a new trial, but in thus broadening the rule we went as far as any court has gone, and further we can not go. So under no phase of the law did the court err in overruling the motion for new trial on this ground; and we, to do so, would have to overrule every decision rendered by this court, and the great weight of authority outside this State as shown above.

Appellant also contends that we erred in holding the letters, etc., found in the grip near the body of deceased, admissible. He in his argument says that any number of persons swear to seeing Earl Mabry in Dallas on Saturday, and that a number testify to seeing appellant with him on that occasion. That Earl Mabry was in Dallas on Saturday is proven beyond the shadow of a doubt by positive testimony. But what witness, among the great array of witnesses, testifies that the body of the young man found near the Texas & Pacific bridge murdered was the body of Earl Mabry, the person whom they had seen in Dallas the day before? Not one, so far as we have been able to ascertain by again searching the record, and appellant points us to none. None of the persons who testify to seeing Earl Mabry Saturday who knew him saw the body after death and say it is the same person they saw the day before. This record discloses that the way the officers were led to believe it was the body of Earl Mabry, with the body they found a lady's

card, and they telephoned this lady, and she informed them she had given a card to a young man Friday night, who said his name was Earl Mabry, and that he said his mother lived in Abilene. The nearest to positive testimony is that of a witness who lived at Marshall, who testified he saw the corpse after it was shipped from Dallas to Marshall, and it was the body of Earl Mabry, but that this was the body picked up near the Texas & Pacific bridge is proven only by circumstantial evidence, and if the State had not offered all the proof it did on this issue, we would be met with the contention, and properly so, that appellant was charged with killing one Earl Mabry, and if he did in fact kill the man found near the bridge, it was not proven it was the body of Earl Mabry. We have frequently had this issue presented to us, and at times we have been compelled to sustain it. (Walker v. State, 14 Texas Crim. App., 609, and other cases.) So as the State was compelled to establish that fact, the *quantum of proof* it should offer is not subject to review, provided a sufficient amount of proof be offered to prove that fact, and the testimony offered was properly admissible to prove that issue. We thought this so well settled we did not deem it necessary to cite but one or two authorities. However, in Kugadt v. State, 38 Texas Crim. Rep., 681, speaking through Judge Hurt, this court held:

"We would further observe, in this connection, that before a person can be convicted of felonious homicide the death of the deceased must be shown to have been caused by the act or agency of such party; and in this State it is enacted by statute that 'no person shall be convicted of any grade of homicide unless the body of the deceased or portions of it are found and sufficiently identified to establish the *fact of the death of the person charged to have been killed.*' See Penal Code, 1895, art. 654. Now, it will be noted that, while the statute requires that the body of the deceased, or portions thereof which are found, must be sufficiently identified to establish the fact of the death of the person alleged to have been killed, yet there is no attempt to indicate the character of testimony by which the identity of the person is to be established. The statute says that the remains must be sufficiently identified; that is, we take it, the statute requires that the proof be of a legal character. Nowhere is it said that the testimony must be positive. If it be circumstantial, that is all that is necessary if it sufficiently identifies the remains or the portions thereof found as those of the deceased. See Taylor v. State, 35 Texas, 97; Wilson v. State, 41 Texas, 320, 43 Texas, 472; Brown v. State, 1 Texas Crim. App., 154; Jackson v. State, 29 Texas Crim. App., 458; State v. Davidson, 30 Vt., 377; McCulloch v. State, 88 Ind., 109; State v. Williams, 52 N. C., 466, reported in 78 Am. Dec., 248, and note 2, at page 253; Campbell v. People (Ill. Sup.), 42 N. E. Rep., 123; State v. Martin (S. C.), 25 S. E. Rep., 113; Webster v. Com., 5 Cush., 386; 1 Bish., Crim. Proc., sec. 1057 et seq.

"The above cases not only show that the body or portions thereof may be identified as that of the deceased by circumstantial evidence, but the

corpus delicti itself may also be proved by this character of testimony. . . . Mr. Greenleaf (volume 3, section 133), on this subject, uses the following language: 'But, though it is necessary that the body of the deceased be satisfactorily identified, it is not necessary that this be proved by direct and positive evidence, if the circumstances be such as to leave no reasonable doubt of the fact. Where only mutilated remains have been found, it ought to be clearly and satisfactorily shown that they are the remains of a human being, and of one answering to the sex, age and description of the deceased. The agency of the prisoner in their mutilation, or in producing the appearances found upon them, ought to be established. Identification may also be facilitated by circumstances apparent in and about the remains, such as the apparel, articles found on the person, and the contents of the stomach, connected with proof of the habits of the deceased in respect to his food, or with the circumstances immediately preceding his dissolution."

This has ever been the rule in this State, and not only in this State; in addition to the authorities from other States cited by Judge Hurt, we find that the Encyclopedia of Evidence, vol. 6, p. 925, says: "Where the question in issue is the identity of a dead body it is competent to show the physical characteristics. So also, the similarity of wearing apparel and articles found on or near the remains to those known to have been in the possession of deceased, may be shown. *The papers or documents* found on the body or in the possession of deceased are competent evidence of identity." Citing State v. Martin, 47 S. C., 67; Thornton v. State, 113 Ala., 43; State v. Dickson, 78 Mo., 438; Bryant's Estate, 176 Pa., 309, and the cases from Texas Reports hereinbefore cited.

Appellant also insists that we erred in holding that the testimony of Amos Clem could be supported. Amos Clem testified to being in Dallas on Saturday evening before the dead body was found on Sunday morning. To prove that this was not true, appellant introduced J. C. Clem, who testified that Amos Clem was not in Dallas that evening, but was at home twelve miles in the country sick in bed. Amos Clem testified that he recognized appellant as the person he saw in Dallas that day and dressed as McCue and whom he saw with two other young men, one of whom had a suit case or grip, and heard McCue saying he was going to the cement plant after a while. This went to disprove appellant's alibi, and placed him with a young man with a grip, and deceased is shown to have been in Dallas that evening with a grip; that he heard McCue say that he was going over to the cement plant after a while, and near to and on the way to this cement plant was where the dead body was found. These were very cogent facts and circumstances, connected with the other evidence, to establish the guilt of appellant. Appellant recognized this, and to break the force of this testimony, he introduced J. C. Clem, who not only testified that Amos Clem was not in Dallas but had him testify that Amos Clem had told him he (Amos) knew nothing about the case, but that he was going to testify. Said all he knew was what his son had told him, and wanted (J. C. Clem) to get a full

description of Frank McCue, appellant, and what kind of hat he wore, and to find out all he could about him. Appellant also proved that Amos Clem had been indicted and tried for murder; that he was a spiritualist, and claimed to be able to talk to the spirit world. It must also be remembered that Amos Clem was as much of a stranger in Collin County as were the relatives of appellant, whom appellant contends it was error to refuse to permit him to support, and he claims it was error in spite of this attempt to impeach the witness Amos Clem, to permit the State to support him. We will first show that it was no error to permit Amos Clem to be supported by other testimony. Perhaps it is true that if appellant had stopped when he had J. C. Clem testify that Amos Clem was not in Dallas this would be a mere contradiction of witnesses, and in such case supporting testimony would not be admissible. But appellant is not satisfied to stop there and has J. C. Clem to testify that a year or more after the killing of deceased, when on their way to Fort Worth to attend a trial of this case, Amos Clem had told him he knew nothing about the case. This certainly would be a contradictory statement to the statement made on this trial. He would also have Amos Clem manufacturing and fabricating his testimony on this trial some year or more after the alleged offense. Now what are the rules of law when you can support a witness? Mr. Branch in his Criminal Law says, supporting it by the citation of authorities quoted: "Where State's witness is attempted to be impeached by showing that he has made statements with reference to the transaction out of court different from and contradictory to his testimony delivered on the present trial, it is not error to allow the State to support the witness by showing that shortly after the transaction he made statements of the matter similar to his evidence delivered on the trial. Goode v. State, 32 Texas Crim. Rep., 508, 24 S. W. Rep., 102; Stephens v. State, 26 S. W. Rep., 728; Sentell v. State, 34 Texas Crim. Rep., 260, 30 S. W. Rep., 226; Dicker v. State, 32 S. W. Rep., 541; Kirk v. State, 35 Texas Crim. Rep., 224, 32 S. W. Rep., 1045; Duke v. State, 35 Texas Crim. Rep., 283, 33 S. W. Rep., 349; Parker v. State, 34 S. W. Rep., 266; Hamilton v. State, 36 Texas Crim. Rep., 376, 37 S. W. Rep., 431; Johnson v. State, 42 Texas Crim. Rep., 378, 60 S. W. Rep., 48; Lee v. State, 44 Texas Crim. Rep., 462, 72 S. W. Rep., 195; Kipper v. State, 45 Texas Crim. Rep., 386, 77 S. W. Rep., 611; Wallace v. State, 46 Texas Crim. Rep., 350, 81 S. W. Rep., 966; Rice v. State, 50 Texas Crim. Rep., 650, 100 S. W. Rep., 771; Pitts v. State, 60 Texas Crim. Rep., 524, 132 S. W. Rep., 801; Sims v. State, 36 Texas Crim. Rep., 164, 36 S. W. Rep., 256; Moore v. State, 31 Texas Crim. Rep., 236, 20 S. W. Rep., 563; Simpson v. State, 46 Texas Crim. Rep., 552, 81 S. W. Rep., 320." And where the testimony goes to charge the witness with recent fabrication of his testimony, and that the witness testifies from corrupt motives, statements of the witness are admissible in consonance with his testimony on the trial made shortly after the happening of the event in support of his testimony. Williams v. State, 24 Texas Crim. App., 665; Jones v. State, 38 Texas Crim. Rep., 103; Jones v. State, 38 Texas Crim. Rep.,

119; Heith v. State, 44 S. W. Rep., 849; Ballew v. State, 42 Texas Crim. Rep., 266; English v. State, 34 Texas Crim. Rep., 200; Reddick v. State, 35 Texas Crim. Rep., 469; Mitchell v. State, 36 Texas Crim. Rep., 278; Romero v. State, 56 Texas Crim. Rep., 437. And as the defendant had attempted to prove by J. C. Clem that appellant was a volunteer witness, and was going to swear to manufactured and fabricated testimony; and by the cross-examination of Amos Clem to prove the same facts, and that he was volunteering as a witness in the case, there was no error in permitting Mr. Samuels to say that he furnished Amos Clem's name as a witness, and informed the county attorney of the materiality of his testimony. (Gonzales v. State, 16 Texas Crim. App., 154.)

Appellant after insisting that Amos Clem could not be supported after he had sought thus to impeach him,—that he had made contradictory statements, fabricated his testimony, and volunteered as a witness, and had assaulted his credibility by proving that he had been indicted for murder, that he believed in spiritualism, table rapping, etc., and proved he claimed he could communicate with the spirits of those who have died and gone before, Clem being a stranger in Collin County, yet inconsistently insists that his witnesses, who had testified to an alibi for defendant, could be supported, although the State had not sought to impeach either of them, prove they had been guilty of any crime, or that they had any peculiar personal characteristics, or that they had theretofore made different or other statements than they had made on the trial of this case. And as we have held that it was not error to permit the State to support Clem under the circumstances above recited, are we equally inconsistent as appellant in holding that appellant's witnesses could not be supported? Let's take the allegations of the bill presenting this issue in the strongest light for defendant. It is copied almost in full in the original opinion, but we will group the allegations contained in various parts of the bill: "It was the contention of the State herein, stoutly argued by the State, both in State's testimony and in argument by counsel for the State, that defendant's defense of alibi was false"; and then says, "the State introduced a great number of witnesses for the purpose of contradicting said members of defendant's family, and for the purpose of destroying defendant's alibi, and for the purpose of showing that it was false," and that the county attorney "in his cross-examination of each and all of the hereinbefore named members of defendant's family subjected each and all of them to *as thorough cross-examination as he could possibly give*"; and counsel for the State "in argument to the jury, stoutly insisted and argued that the alibi of defendant was false, and argued to the jury that even if one of the State's witnesses who swore that defendant was east of the Trinity river and in the City of Dallas proper during any part of the Saturday immediately preceding the Saturday night on which deceased was killed, that the alibi of defendant was false, and not under circumstances to be believed; that the fact that a great number of State's witnesses had positively sworn that on the Saturday, and during dif-

ferent times on said Saturday, showed that at least some of said witnesses were bound to be telling the truth about having seen the defendant in the City of Dallas proper, and that it was preposterous and impossible that all of said witnesses could be mistaken, or that all of said witnesses were swearing falsely about having seen defendant on that day"; and then it is alleged that the witnesses had resided in Dallas County for more than seventeen years, and had never at any time resided in Collin County, where this case was tried, and were strangers in said county. Then follows an allegation that defendant offered some half dozen witnesses, who also resided in Dallas County, except one who lived in Collin County, who would have testified to the good reputation for truth and veracity of the witnesses named in the bill, to which testimony the State objected on the ground "that there had been no attack made upon the reputation of the witnesses who testified in any way, and no predicate laid to impeach them or either of them," which objection was by the court sustained, to which action of the court defendant excepted on the ground that the witnesses who testified to defendant's alibi were strangers in Collin County, and strangers to every member of the jury; *that they were examined thoroughly and rigidly on cross-examination,* and defendant was entitled to show that his witnesses were of an unimpeachable character, and the jury thereby enabled to judge of their credibility." We have restated this bill, because it is so much insisted on not only by original counsel for appellant, but also in a supplemental brief filed by Mr. Wenckey, an attorney of Dallas, who married a sister of accused.

Now, what are the allegations? That the witnesses were strangers in Collin County, and were subjected to a thorough and rigid cross-examination; that the State introduced witnesses who testified that appellant was in Dallas proper on that Saturday, and not in Oak Cliff at home as testified to by defendant's witnesses; that the county attorney in his argument insisted that the *alibi* was false, because it would have been impossible for so many persons who testified to seeing him in Dallas to be mistaken. It is the first time the proposition has been presented that the argument of counsel upon the weight of the testimony adduced after the testimony had closed would furnish grounds upon which to introduce testimony supporting a witness or witnesses whose testimony was criticised by counsel in their argument to the jury. As anyone knows, appellant's able counsel certainly also in their argument insisted that the testimony of an alibi was true, and the testimony of the State's witnesses on this point was untrue and the witnesses mistaken. When testimony pro and con on this issue was introduced, it was done that the jury might determine which was correct, and counsel on each side had the right to comment thereon. In the bill it is not claimed that counsel for the State in his cross-examination or other testimony in any manner reflected on the character or reputation of the witnesses for defendant on this issue, but merely that the State through counsel and by the evidence offered by it sought to prove that the alibi was untrue. The rule of law is that proof of general reputation of witnesses for

truth and veracity is not admissible where no attack has been made on the witness, but there is mere conflict in the testimony offered by the State and the defendant, and this is all there was in this case. Britt v. State, 21 Texas Crim. App., 215; Rushing v. State, 25 Texas Crim. App., 607; McGrath v. State, 35 Texas Crim. Rep., 413; Murphy v. State, 51 S. W. Rep., 940; Harris v. State, 45 S. W. Rep., 714; Payne v. State, 40 Texas Crim. Rep., 290; Jacobs v. State, 42 Texas Crim. Rep., 353; Zysman v. State, 42 Texas Crim. Rep., 432; Hill v. State, 52 Texas Crim. Rep., 241; Bass v. State, 65 S. W. Rep., 919; Rutherford v. State, 67 S. W. Rep., 101. It is true that there has been a slight limitation placed on this general rule in this State where the witness is a stranger in the county where he testifies, and this is where the witness "is *assailed on cross-examination by questions attacking his credibility and tending to bring him into disrepute before the jury,* he may be sustained by proof of his general reputation for truth and veracity." (Phillips v. State, 19 Texas Crim. App., 158; Crook v. State, 27 Texas Crim. App., 198; Harris v. State, 49 Texas Crim. Rep., 338; Goode v. State, 57 Texas Crim. Rep., 220.)

In the Phillips case, supra, it was held that where the witness was a stranger and testified to isolated facts, and the cross-examination to which *he was subjected tended strongly to discredit his statements,* he could be supported. But as hereinbefore shown, in this bill there is no allegation that the witnesses or either of them was subjected to a cross-examination which *tended to discredit the witness,* the only allegation being that county attorney "cross-examined the witness as thoroughly and rigidly as he could," but it is not claimed that questions propounded nor the answers given were such as tended to discredit the witness. And this case is as far as this court has ever gone, but now appellant would have us expand the rule further and hold that if there is a conflict in the witnesses for the State and defendant, and they are strangers, their testimony may be supported. We have searched our reports for a case so holding and we find none. The Encyclopedia of Evidence, vol. 7, p. 229, says: "In Connecticut *only,* the mere fact that a witness is a stranger in the community warrants the introduction of proof of his reputation for truth and veracity." We can not expand the rule as desired by appellant in the face of all of our own decisions, and the courts of last resort of all the States in the Union except Connecticut. We have read the opinion in the Connecticut case, and it does not appeal to us, for it would open so wide the door that there would be no end to trials. To do so, as in this case, the venue being changed from Dallas to Collin County, every witness offered either by the State or defendant could be supported by proof of reputation, and the trial would become, instead of a trial of whether or not the person on trial was guilty of the crime charged, a trial of which witness had the best reputation for truth and veracity, and the issues really involved wholly lost sight of. Judge Henderson, in Murphy v. State, 40 S. W. Rep., 978, citing the Phillips case, supra, and other cases, speaking for the court, holds: "We do not understand the rule to be, though a party be a stranger in the

county of the trial, that if merely some contradiction is shown between the testimony of the witnesses for defendant and the witnesses for the State, it is permissible to introduce testimony as to the reputation of the witness in the community in which he may have lived.    The State did not make an attack on these witnesses on cross-examination tending to bring them into disrepute."    Not only is this the rule in this court, but in our Supreme Court it is also said to be the prevailing rule of law of this State in the case of T. & P. Ry. Co. v. Raney, 86 Texas, 363, wherein it is held:

"The fact that a witness is a stranger or well known will not influence the determination of the right to support his evidence when impeached or attempted to be impeached.    Every witness is presumed to be truthful until the contrary is proved.    Contrary to all rules on the question, the doctrine invoked in this case would allow a party to make an issue on his own witness' character, and proceed to defend it before it has been assailed.

"In Mobile Railway Company v. Williams, 54 Alabama, 168, supra, speaking upon the question, the court said: 'Such conflicts often arise in the course of trials before juries, and must be settled by a careful consideration of the evidence of each witness—the consistency of his testimony, his general demeanor, and the interest or feeling he may have involved.    They furnish no ground for admitting evidence as to character; if they did, trials would be indefinitely prolonged, and the real issues on which the jury should pass embarrassed and lost sight of in the consideration of mere collateral matter.'

"This statement is clear and to the point.    It puts the matter in its true light, with the evil consequences to flow from such a departure from the well established rules of the law.    If plaintiff had the right to sustain himself because he was contradicted, so had the defendant the right, in the same manner, to sustain the character of each witness that plaintiff contradicted.    If his being a stranger controls in the matter, then defendant could have introduced evidence as to the character of the witnesses whose depositions it took, and thus the case would have been converted into one of investigation of character, with as many issues as there were witnesses."

In the case of Crook v. State, 27 Texas Crim. App., 198, it was held it was not error to permit the witness to be sustained by proof of general reputation as he was a stranger, and his credibility had been attacked by the defendant by showing or attempting to show that he had made *contradictory statements.*

In the case of Harris v. State, 49 Texas Crim. Rep., 338, it was held that a witness who was a stranger could be supported by proof of general reputation, as "many of the questions on his cross-examination went directly to *impugn his character,* show the falsity of his testimony before the jury, and bring him into disrepute before the jury."

In the Goode case, 57 Texas Crim. Rep., 220, 123 S. W. Rep., 606, it was held it was permissible to support the witness because "it seems to have been the theory on behalf of appellant's counsel, that the witness

had either killed Tilden Goode or procured it to be done, and in many ways this suggestion in cross-examination is put forward and imputed to the witness in no uncertain language. In addition to this numerous predicates were laid to contradict the witness, and he was attacked in every possible way by interrogation, innuendo, and in almost a direct charge, so as to bring him into disrepute and discredit."

Many other cases could be cited, but these are cited by appellant, and are the only ones cited where the issue of a stranger witness was presented and the testimony admitted, and it is readily seen that the allegations of the bill of exceptions in this case do not bring appellant within the rule announced in these cases, while this court in the case of Payne v. State, 40 Texas Crim. Rep., 290, seriously questioned the rule of law as announced in the Phillips case, supra. However, as will herein be noticed, we have taken as a criterion in passing on this case the rule as announced in the Phillips case, and demonstrated that under it appellant was not entitled to have testimony admitted as to general reputation of his witnesses, yet the true rule that has been adopted by this court as evidenced by all the decisions is the one laid down by Mr. Wharton, when the witness is a stranger: "It is further held that such evidence may be admitted on particular discrediting facts being developed against the witness on his cross-examination." No other exception than this has ever been adopted by this court on account of the witness being a stranger, when that issue was before this court, and as herein shown, the same rule prevails in our Supreme Court.

The other question presented in the brief and ably argued is that the court should have sustained the objections to the testimony showing that appellant was a frequenter of saloons, and a visitor at a negro house of prostitution, etc. We do not care to take up these bills separately, but we will discuss the question more or less at length, and herein dispose of all of them. That appellant was a habitue of the saloons was necessarily involved in legitimate facts going to make the case under appellant's plea of not guilty and alibi. Pringle, the self-confessed accomplice, says that on the Saturday that the homicide occurred at night, he met appellant with a young fellow, slender built, who had on a blue checked suit and a white hat with a leather band around it. That this was Earl Mabry, who was killed by them that night. That after meeting them, appellant said, "Let's get a drink," and they all three went in a saloon and took a drink; that they were drinking all the time they were together that day, and drank at four different saloons. That when they all left Fisher's saloon, they went then into the bowling alley, when McCue left them for a while. He testified the grip found by the dead body looked like the grip Mabry had when they were together. That all three got back together and started to the cement plant, and when just across the Texas & Pacific bridge appellant struck Mabry in the back of the head, and then cut his throat, while he, Pringle, stabbed him several times. That appellant had told him that day they would get Mabry's money.

Vol. 75 Crim.-11

Fawn Simpson testifies that on that Saturday he saw appellant sitting in Joe Harbrecht's saloon at a table drinking, a young man of Mabry's description being with him. Ike Owens testified that he was working in T. H. Morris' saloon on that Saturday, and about 6:30 in the evening appellant, Pringle and deceased, Mabry, came in the saloon together; that they stood around in the saloon and had a few rounds of drinks, and that they left together, and at deceased's suggestion they took another drink. Callie Flowers testified she saw deceased and two boys in "Sam and Ed's" saloon that Saturday evening. All this and other testimony of like character was admissible beyond question on the question of alibi, and placing appellant with deceased. And it shows him to be a frequenter of the saloons and a drinking man. But appellant perhaps would contend that this does not show he was a visitor at Fannie Howard's saloon and negro bawdy house. If this was to be kept out of the record the State could not make its case, for J. F. Stanley not only says he saw appellant in Dallas proper that Saturday evening, but also testifies that he saw the young man whose body was found dead next morning (Sunday) near the bridge, on the sidewalk on Jefferson Street near the courthouse, and appellant, McCue, was then in about six feet of him. He knows the young man he saw near McCue is the same person, for he went out to the dead body Sunday morning, and while there a knife which was introduced in evidence was identified by him as the knife picked up near the dead body. This knife had the name "Bill Best" on it, and the point was broken off. Sis Hamp swears this knife belonged to appellant, for she says she saw him with it Friday night at Fannie Howard's place; that Frank was there buying beer and smoking hop, and broke the point off cleaning the hop bowl the Friday night before the killing. She also testified that a watch found by the body of the deceased was appellant's watch; that about a week before the killing appellant was at Risa Beasley's and Fannie Howard's and had the watch, and she was going to put her picture in the watch and made a scratch on the watch showing appellant where she was going to put her picture in it. Appellant in order to break the force of this testimony showed that Sis Hamp was a negro prostitute, and the house she was at (Risa Beasley) was a negro house of prostitution. Sis Hamp also testified that on the night of the homicide appellant and Pringle came to this negro house of prostitution; that their hands were all bloody; that they washed the blood off their hands; that their clothing was bloody and dirty; that they washed themselves and changed shirts, getting the shirts out of a dresser drawer. That they pulled off their pants, and appellant got a pair of pants that "Charlie" had been wearing and put them on; that Pringle had another suit there. That she had seen appellant at Fannie Howard's place on that Saturday morning and again Saturday night. (This was admissible on alibi.) That the first time appellant and Pringle came to Fannie Howard's that night Pringle, in the presence of appellant, borrowed a dollar from her, saying they were going to the cement plant to play craps, and if he won he would come back and make her drunk.

That later in the night they did come back, and were bloody as herein-before stated. That when they came back they had money, and stayed at her house just long enough to wash the blood off, etc., when they all went to Fannie Howard's place, and Risa Beasley was there. That appellant and Pringle went to Fannie Howard's ahead of her, and when she got there appellant and Pringle were in the parlor. That they spent the night there buying beer and smoking hop; that she stayed there with them. Appellant does not question the admissibility of this testimony, but assaults it as incredible in every way conceivable. Gertrude Wilson also testified that appellant was there that Saturday night, for while she did not see him she heard his voice in another room. That she knew him well and recognized his voice, for she had met him frequently. So that evidence, from the State's standpoint, that appellant was on intimate terms with these negro prostitutes, and visited these houses, was inevitable if the State was to make its case, and the admissibility of this testimony can not be questioned. The credit to be given to it is another question, and one for the jury and not for us.

However, appellant may contend that nevertheless testimony that he was seen driving with these negro prostitutes in the buggy with him on Tuesday after the homicide, and when he got out of the buggy he went into Jew Jake's saloon and treated the crowd, should not have been admitted. Evidence was offered by the State that appellant had no money before the homicide, and had been pawning property with Abe Goldstein a short time before the killing to secure money. Sis Hamp testified that when she was at Risa Beasley's and Fannie Howard's place Saturday night (when she says he was bloody) he had money to buy beer and smoke hop and treat. The State's evidence shows that he secured a new suit of clothes Monday after the homicide, and put them on in Goldstein's place of business; that he had money after the homicide to hire a buggy and horse would be admissible on this issue, and that he had two negro prostitutes with him in the buggy at this time would not render the testimony any the less admissible; that when he got out of this buggy he went into Jew Jake's saloon might not be admissible, if that was all that the officers who swear to that fact testified to, but they swear that at this time he invited them to drink, treated the crowd there in Jew Jake's place, rattled money in his pocket besides the money he threw on the counter. This took place Tuesday night after the homicide on Saturday night, and was admissible as a circumstance showing that he had money after the homicide, as was the fact he secured a new suit of clothes on Monday after the homicide. It is true there is testimony in the record explaining where he got the new suit of clothes, but none where he got this money he was spending. Again it is insisted that if all this was admissible, then certainly it was not permissible to prove that he was arrested on Thursday, and when he was arrested he was coming out of an alley between Fannie Howard's and Risa Beasley's places, negro houses of prostitution. Appellant emphasizes the fact that this testimony was calculated to prejudice the jury against him. As hereinbefore shown there was ample legitimate evi-

dence showing that he visited these places and evidence that was absolutely necessary to be introduced by the State, if it was to corroborate Pringle in his testimony that appellant killed Mabry. One of the strongest corroborative facts in the record is that the knife found by the dead body was the knife of appellant, and the witness who identifies the knife as belonging to appellant does so by the point being broken, and that she saw him break it in cleaning a "hop bowl" at Fannie Howard's place the night before the killing. Appellant seeks to show the watch found by the dead body was not his watch, but nowhere in the record is there any evidence tending to show that this was not his knife. That the State would rely on this circumstance for corroborative testimony, was emphasized by the county attorney calling one of appellant's counsel and identifying the knife as the knife Sis Hamp had identified on a former trial of the case, she being dead at the time of this trial. But was the testimony of these officers that when they arrested him he was coming from this place inadmissible for any purpose? As shown in the original opinion, Gertrude Wilson had testified while she did not see appellant at Risa Beasley's place between ten and eleven o'clock the night of the homicide, yet she heard him talking and recognized his voice—heard him talking upstairs. That she had met him at these places frequently and knew his voice. That this testimony was admissible on his plea of alibi none can question; that it was admissible in support of Sis Hamp's testimony, who said appellant was there at this house washing the blood off his hands, can not be questioned, and as this testimony was admissible under all the rules of law, and when appellant sought to impair the credit of these witnesses by showing they were negro prostitutes, inmates of negro houses of prostitution, and impeach them otherwise, when this witness Gertrude Wilson testified to knowing appellant's voice, as she had seen him frequently at this place, testimony that he was frequently at these places would be admissible as corroborative of this testimony, and for this reason was able to recognize his voice.

These are the objections urged to the admissibility of the testimony in the argument on the motion for a new trial. As the verdict was for the life imprisonment of a young man, and the contention that we had erred in the original opinion is so ably and insistently urged in the motion for rehearing, caused us to again thoroughly re-read, re-examine and endeavor to digest this voluminous record, as well as argument of counsel. After doing so we are more thoroughly convinced there was no error committed in the rejection or admission of any of the testimony. It is unfortunate for the young man that the testimony tending to show his guilt would necessarily show his presence at these negro houses of prostitution, but the fact the life we lead will necessarily have a bearing in every walk of life has been too often demonstrated to need discussion. Of course, that he had visited these places could not be shown as independent facts to prejudice his case, but when his visits to these places is necessarily entwined in and around the circumstances which the State legitimately offers as evidence tending to show his guilt,

that these circumstances necessarily disclose his visits to these places does not render the testimony inadmissible because some feature of it might have a prejudicial effect.

And having come to the conclusion that no testimony was improperly admitted or excluded, we have again read the charge, and appellant's criticisms thereof contained in his sixteenth bill of exception, and in his motion for a new trial. The motion alone embraces fifty-nine pages of typewritten matter. There was no issue of any degree of murder other than murder in the first degree suggested by the testimony, and the court submitted only that degree, and of this appellant does not complain. His defense was an alibi, together with a plea of not guilty. The court fully and fairly submitted the issue of alibi in consonance with all of our decisions. McCoy v. State, 56 Texas Crim. Rep., 551; Hines v. State, 40 Texas Crim. Rep., 23; Caldwell v. State, 28 Texas Crim. App., 566; Harris v. State, 31 Texas Crim. Rep., 411; Stevens v. State, 42 Texas Crim. Rep., 154; Wigfall v. State, 57 Texas Crim. Rep., 639, 124 S. W. Rep., 649; O'Hara v. State, 57 Texas Crim. Rep., 577, 124 S. W. Rep., 95; Morrow v. State, 56 Texas Crim. Rep., 519; Crowell v. State, 56 Texas Crim. Rep., 480; Mass v. State, 128 S. W. Rep., 394; Williams v. State, 54 Texas Crim. Rep., 30; Gallaher v. State, 59 Texas Crim. Rep., 390, 28 Texas Crim. App., 247; Walker v. State, 6 Texas Crim. App., 576.

Pringle testifies positively that appellant struck deceased in the back of the head with an iron bar, and then cut his throat, showing that he himself also stabbed deceased in the breast. This made Pringle an accomplice, and the court so instructed the jury, and in language frequently approved by this court, submitted the issue of his corroboration. Brown v. State, 57 Texas Crim. Rep., 570; King v. State, 57 Texas Crim. Rep., 363; Herron v. State, 53 Texas Crim. Rep., 147; Mizell v. State, 59 Texas Crim. Rep., 226, 128 S. W. Rep., 127; Chandler v. State, 60 Texas Crim. Rep., 329, 131 S. W. Rep., 603.

These issues being correctly submitted to the jury, the court instructed the jury that they must believe from the evidence beyond a reasonable doubt that appellant either alone or with the assistance of another, with express malice aforethought, with a sedate and deliberate mind and formed design to kill, did unlawfully kill Earl Mabry, or they would acquit, giving the usual and customary charge on presumption of innocence and reasonable doubt. Such criticisms, that there was no evidence that he acted alone, etc., are hypercritical under the evidence on this trial. Our code provides that if there be errors in the charge of the court, yet if such errors were not calculated to injure the rights of appellant, the judgment shall not be reversed. While the charge in this case may be subject to some verbal criticisms, yet when read as a whole, it fairly, succinctly and correctly presents the law as applicable to the evidence adduced on this trial, and the criticisms present no ground for reversal of the case. Nor was there any error in refusing to give either of the three special charges requested, the first requesting the court to instruct the jury not to consider the testimony of Ike Owens

This court has held that when the witness is dead his testimony given at a former trial may be reproduced. The second and third requested the court to instruct the jury not to consider the letters and check-book found on deceased for any purpose. We have held herein they were admissible on the issue of the identity of deceased, and the court did not err in refusing to give the charges as requested. While it would have been proper to limit this testimony to the issue of identity, yet the failure to do so in the absence of any requested instructions to so limit it presents no reversible error.

As hereinbefore stated, we have read and re-read this record, and as thoroughly digested it as we could, for there can be no doubt that appellant's counsel believe most firmly that their client is not guilty of the offense charged, and have endeavored to impress that fact on our minds, yet we think on mature deliberation they will be compelled to conclude that under the evidence in this case that this was a question for the jury, and for us to disturb the verdict on that ground under the evidence in this case we would be transcending our authority and usurping the functions given by law to the jury, and the motion for rehearing is, therefore, overruled.

*Overruled.*

DAVIDSON, Judge.—For several reasons this judgment ought to be reversed. Will write briefly as soon as I can do so.

November 4, 1914.

DAVIDSON, Judge (dissenting).—The opinion deciding the case was written some time ago and motion for rehearing overruled. The adjournment for the term came shortly afterward and I have not taken up the case previously with a view of writing out my dissenting views.

In the original opinion it was stated by the writer thereof that the "question presented by this record is, was appellant one of the participants in the crime?" That was one of the questions, but there are very important legal questions presented which were of crucial interest not only to the defendant but to a correct view of the law. It was a question, and a serious question. whether appellant was a participant in the crime. The jury found that he was, and my brethren approved that finding. I more than questioned the fact that appellant was a participant in the crime. This was a case of murder, and if appellant participated, as the accomplice stated, it was a horrible killing, and done in the perpetration of robbery. The testimony of that accomplice comes in such questionable shape and is contradicted at so many points by the various witnesses for the State, that I hardly feel willing to say that this young man ought to be in the penitentiary for the balance of his life on such testimony, especially in view of the fact that an alibi *clear, forcible* and *strong* was shown, which placed him in such position that he could not have been a participant in the homicide. The accomplice Pringle was contradicted so often about his relation to appellant during

the day preceding the crime, or in the alternative he contradicted the other State's witnesses so that his testimony was hardly worthy of belief, *independent* of the fact that he was an accomplice and ostracized by the law for this reason.  It seems also that this Pringle was put in the jail and for some time in the death cell and made a contract with the State before he found the light of day from that apartment, to testify for the State.  It is a serious matter to deprive a citizen of life and liberty on the testimony of this sort of witness, and this character of evidence.

Bill of exceptions No. 10 was reserved to the introduction of a number of letters found about the body of the deceased.  These letters were from the relatives of the deceased, containing admonitions and expressions of endearment and matters of that sort at some length.  Various objections were urged, and the court seems to have permitted them to go before the jury, and my brethren have sustained the ruling, on the theory that the letters were admissible, as well as their contents, on the question of identity of the deceased.  If the letters were addressed to Earl Mabry, and there was an issue as to whether this was the body of Earl Mabry, or it became necessary to resort to the address of the letters in order to show that probably the name of the deceased was Earl Mabry, there might be some cogency in this statement or conclusion of the majority opinion.  I am led to believe their holding was based upon Campbell v. State, 8 Texas Crim. App., 90; at least it is cited.  That case, in my judgment, is not applicable.  That was a case of circumstantial evidence.  The identity of deceased in that particular case was of serious moment, but that there may be no mistake about the condition of that case on the line of which I have stated, I take this quotation from it:  "There was no eyewitness to the homicide.  No one who saw the body was able to identify it or was acquainted with John Booth, for whose murder the appellant was on trial.  By a personal description, however, and articles found on and near the body, the prosecution was enabled to identify it as that of a man who passed the night of the preceding September 27th at the house of John Galbraith, two miles south of Weatherford, and who, in May, 1878, was known to Galbraith as John Booth."  Further quoting from that opinion I find this language:  "We see no good reason why the court should have excluded evidence of the contents of the valise of deceased, or the memoranda in the blank book and the mail contract found therein, since these were circumstances going to establish the identity of deceased, who appears to have been a stranger to all the witnesses who saw the body after the homicide."  The Campbell case was one purely of circumstantial evidence, there being no eyewitness to the homicide as an inspection of that case will show.  The issue of identity was an important issue and could not be proved otherwise.  There was no question of that sort in this record.  The body of Earl Mabry was as thoroughly recognized as was possible for a body of a deceased to be recognized and identified.  If it was necessary or proper to introduce the letters, the State was not authorized to go beyond the fact that the letters were addressed to Earl Mabry and signed by the parties who could testify that they wrote the

letters found on his body, but the contents of these letters, the details and statements containing advice and admonitions and expressions of love and affection and endearment and other matters of that character, tended to arouse the passions and feelings of the jury against the accused and in favor of the deceased, as well as arouse the passions and feelings of the jury in favor of deceased's mother, sister and other relatives against appellant, who was on trial for the murder of the son and brother. I agree with the Assistant Attorney General in this statement of his brief: "But it was probably not admissible to have the contents of these letters read to the jury. I am unable to see how it could have been admissible or why it was thought material or relevant to any issue to read the contents of these letters."

Bill No. 9, along the same line, was reserved to the introduction of a day book in evidence, found at the body of the deceased and the contents of it; the writings and entries and all matters of that sort were permitted to go to the jury. The majority, affirming the case said: "The time book was not admissible to show these facts, if it did so show, but was admissible only on the question of identity of deceased and the objections to that portion of the argument of State's counsel should have been sustained." It seems that this formed the basis of another bill of exceptions to the effect that the county attorney made an inflammatory argument for the purpose of arousing the passions, sympathies and prejudices of the jury, as shown by bill No. 4. How the entries in that account book, showing various dates and figures and where he had worked and pay he had received during the part of his life, could have served to identify him is just a little difficult to understand, but there was no issue as to his identity. The defendant did not controvert his identity, and it was proven by many witnesses to be the body of Earl Mabry. So there could be no disputed issue, and all this testimony was erroneously admitted, even under the above statement of the majority opinion. The majority hold the argument of the county attorney was error, and that the book was not admissible to show the purported facts therein recited, but that although error was committed, it was harmless. To cure this as far as could be done under the circumstances, the appellant asked a special charge seeking to remove the error. This was not given. The damaging effect of this sort of testimony and argument was dangerous and illegal and ought not to have been permitted. It was and is clearly reversible error.

Another bill of exceptions was reserved to the State proving that Gertrude Wilson in 1907 lived on Market Street with Risa Beasley, next door to Fannie Howard, and that in September, 1907, she heard of the killing of deceased and at that time she was acquainted with appellant and had often seen him at the Beasley woman's house. Another bill shows the State placed Will Chick upon the stand and proved by him that in the fall of 1907 he was deputy sheriff of Dallas County and knew appellant and arrested him in this case. The State went further even than that and showed by him that at the time he arrested appellant that he did so on Market Street. Pursuing this line they

proved by him further that the arrest occurred on South Market Street. Having reached this point the State was permitted to prove where the arrest was made with reference to Fannie Howard's place, and he testified: "I arrested him in front of Fannie Howard's place." The State then propounded to him the following question: "Her place— what character of place is it?" and the witness answered, "A sporting house." He was then asked if it was a saloon, and he answered, "Yes." Pursuing this further he was asked and permitted to testify that it was a house of prostitution. In this same connection, the prosecution also, as shown by another bill, while the accomplice Pringle was on the stand, was permitted to prove by him that he had frequently seen appellant at Fannie Howard's place of business, and the first time he ever met him was at Fannie Howard's saloon on Market Street. Then this question was asked him: "That was a negro house of prostitution?" The witness not answering the question, it was repeated in this form: "State what kind of a house of prostitution it was, with reference to color," and witness answered, "A negro sporting house." All this occurred when the State was making out its case in chief and introduced as original testimony.

Another bill shows that the State was permitted to prove by Briggs and McDougal that several days after the commission of the crime they had seen appellant buggy riding with negro prostitutes, and had seen him drive up in front of a negro house and that negro women lived in the house. In regard to the testimony first alluded to in the series of bills of exception, that is, with reference to having associated with the women Beasley and Fannie Howard, etc., it is conceded to be erroneous, but it was held harmless on the theory that appellant was guilty of murder in the first degree, and received a life sentence instead of the death penalty.

I agree with the Assistant Attorney General again, as far as he has gone with reference to the testimony as set out in bill No. 3, above referred to, that is, the testimony of the witness Will Chick, in which he says: "Bill No. 3 complains that Officer Chick while on the stand was permitted to testify that on Thursday after the killing he arrested defendant and that he arrested him at the house of Fannie Howard. That Fannie Howard was a negro whore and ran a negro saloon and whorehouse. Appellant insists that this testimony was not admissible for any purpose and was very damaging to him. I submit that I do not see the materiality or relevancy of this testimony, and evidently counsel for the State knew it was irrelevant and that it was introduced for the purpose of showing that appellant was a habitue of a negro whorehouse, etc." There is no merit in the proposition that the admission of this testimony was harmless error. The testimony was of a very damaging character. Here was an issue of guilt before the jury, an accomplice and self-confessed murderer contradicted by many of the State's witnesses on everything except the immediate facts of the killing, which they did not see, testifying to the homicide for the purpose of robbery. On the other hand, appellant denied any connection with

it, and proved by his witnesses that he was sick at home in bed at the time and was not there. Now, we have the testimony of these witnesses to the effect that the officer arrested appellant, indicating his view of the guilt of the man; that he arrested him at a negro saloon, in a negro whorehouse, and that his associates were negro whores, and that he was a habitue of negro whorehouses. Appellant had not placed his reputation or character in issue; his life was in the balance before the jury, and the issue sharply drawn of his connection with the killing, the State making a case by a self-confessed murderer, and the defendant meeting that by evidence that he was not present and knew nothing about it, and had no connection with it. This character of testimony, that the witness arrested appellant, believing he was guilty; he arrested him at a negro saloon and whorehouse, and that he habitually associated with negro whores, was thrown in the balance against him when he had not placed his character or reputation before the jury. If there could be more damaging testimony than this, it would be difficult to conceive it could be. There are a number of cases which hold, and so far as I know without exception, that the State will not be permitted to show the character of the associates of the accused. In Holsey v. State, 24 Texas Crim. App., 35, it is stated: "There is no rule of law which will permit an inquiry into the character of defendant's associates, and in permitting such inquiry the trial court erred." In Arnold v. State, 28 Texas Crim. App., 480, it was said: "It was also material error to permit the State to prove over defendant's objections, the bad character of the women who resided in the vicinity of defendant's residence and with whom the defendant sometimes associated. Such evidence is irrelevant and incompetent. Holsey v. State, 24 Texas Crim. App., 35." See Hudson v. State, 41 Texas Crim. Rep., 453; Jennings v. State, 42 Texas Crim. Rep., 78. In all these cases the court reversed the judgment, holding that the testimony was hurtful and damaging, and being erroneously admitted necessitated a reversal. The State can never put the defendant's reputation in issue until he has first introduced evidence on that line. The State used all this testimony as original evidence. How testimony could be more hurtful would be difficult to conceive. But this is met with the statement that appellant got the lowest punishment for murder in the first degree, that therefore it was harmless. The trouble is, the defendant was *convicted*, and of murder in the first degree, and it may be that if this and similar testimony had not been introduced the jury might have solved the issue in his favor and acquitted. It seems there had been previously four hung juries in the case, nearly all of the jurors in favor of acquittal. If the guilt of the accused had been conceded, or there was no issue upon the question of his guilt of murder in the first degree, then there might be some merit in the statement that it was harmless, but no evidence is harmless which when erroneously admitted tends to solve the issue against the accused. The issue here was one of guilt. The law declares him innocent until he has been proved guilty beyond a reasonable doubt. The State had introduced a self-confessed accomplice who testified that he and appellant did the

killing. The corroboration was anything but satisfactory. All of this testimony was introduced to show that Pringle met him for the first time at a negro whorehouse and by other witnesses that he was associating with negro whores, going buggy riding with them and was arrested at a negro whorehouse. The issue is sharply drawn that he was not guilty, and yet this is held harmless error. The jury thought it was very harmful and gave him murder in the first degree, solving the question against him. I will here state that no error is harmless which brings about a conviction or tends to solve the issue against the accused and in favor of the State, either to bring about a conviction, or in case of guilt it tends to bring a verdict higher than the minimum or lowest punishment. All such evidence is essentially harmful. Just what effect this sort of illegal testimony had upon the minds of the jury can only be inferred or concluded from the fact that the verdict reflects the belief of the jury that he was a man guilty of murder. This language is found in the opinion of the court in this connection: "And if the jury had given the death penalty, then it might be said that this testimony inflamed their minds against appellant, but they did not assess that punishment but gave him the lowest punishment the law authorized for the crime submitted to them, so evidently this testimony created no prejudice in the minds of the jury, as it would not and could not affect his defensive theory and testimony, and if it did tend to support the State's evidence and theory it would be admissible for that purpose. If error there be, in admitting this testimony, it would not call for a reversal of the case." Defendant did not testify. His witnesses, who were his relatives, testified to an alibi. This testimony evidently impressed the jury with the fact that his alibi was not true. It solved all the questions against him, or tended to do so by inflaming their minds against him because he associated with the people mentioned.

Speaking of this matter in Malcolmson v. State, 25 Texas Crim. App., 267, Judge Hurt uses this language: "If, therefore, in a case where there is a conflict of testimony, or a case in which the jury would be justified, from the meagerness of the evidence, in finding a verdict of not guilty, and still the evidence is such, as to require an affirmance of the judgment by this court, if the jury should convict, then the admission of incompetent evidence with the slightest tendency to injure or to place the accused in an odious light before his jurors should, and will be ground for a reversal of the judgment." To the same effect is Somerville v. State, 6 Texas Crim. App., 433. In that case the court said: "When a defendant is on trial for a capital felony it is a matter of the highest importance to him that no improper testimony be admitted against him, over his objection."

Mr. Wharton says: "In criminal cases courts will rarely presume that the particular evidence which has been wrongfully admitted could have no influence on the deliberations of the jury." In the Somervell case appellant received the minimum punishment for murder in the first degree, as did appellant in this case. Possibly it is well enough to cite a few cases showing the illegality of this testimony and its prejudicial

nature: Wharton's Criminal Evidence, vol. 1 (10 ed.), 41; Thompson v. State, 38 Texas Crim. Rep., 335; Dysart v. State, 46 Texas Crim. Rep., 52; Conway v. State, 33 Texas Crim. Rep., 329; Staten v. State, 32 Texas Crim. Rep., 33; also in point see 6 Wis., 417, 76 Wis., 99, 34 N. Y., 233.

Another bill of exceptions shows that after appellant had closed his case the State put Amos Clem on the stand as a witness and proved by him that he saw appellant on Main Street in the City of Dallas in the block east of the courthouse going in a westerly direction; that he saw him in the evening between the hours of one and three o'clock, and that at the time he saw him he heard someone say to him, "Hello, McCue, where are you going?" and heard the man addressed as McCue say in reply, "I am going to the cement plant after a while." The witness further testified that on the night of the offense, about ten minutes before seven o'clock, he saw defendant and two other boys, one of whom was carrying a grip, at the corner of Main and Jefferson Streets, just east of the courthouse, in the City of Dallas, and saw the three going north across Main Street and into a saloon on the northeast corner of Main and Jefferson Streets. The bill also shows after this testimony was introduced appellant placed J. C. Clem, a cousin of Amos Clem, on the stand and proved by him that he resided west of Dallas and that in 1907 he lived near Grand Prairie, about ten miles from Dallas, and that he was acquainted with Amos Clem, his cousin, and that he remembered hearing of the finding of the deceased's body, and heard of this on Sunday, and that he first heard it from L. A. Clem, who was a brother of Amos Clem, and that on the afternoon of the day that Amos Clem had testified to having seen appellant on the streets of Dallas, that witness J. C. Clem was at the residence of L. A. Clem, and that Amos Clem was there at the same time, and that this was about five o'clock or between four and five o'clock on said afternoon, and that Amos Clem arrived at said house a few minutes after the witness went there, and that Amos Clem was sick at the time, and fell over on the porch with a sick spell, and that the witness got a pail of water and bathed his head for an hour or two. That Amos Clem was in the habit at that time of having such spells, and that Amos Clem left said house about dark and went from there to his home, the said Amos Clem then living about ten miles from Dallas. After these proceedings, the bill shows defendant rested his case, and the State then placed upon the stand Samuels, who testified, among other things, that he had seen State's witness, Amos Clem, in the City of Dallas near the courthouse on the Saturday evening of the night of the killing, and had seen him at the corner of Jefferson and Commerce Streets, immediately east of the courthouse, about six o'clock. This witness was then permitted to testify that the State's witness, Amos Clem, had told him, Samuels, that he saw appellant in Dallas on the day of the killing, and then the State propounded to him the following question: "Did he tell you that he heard a fellow speak to him and say to him, 'Hello, McCue, where are you going?' and that McCue told him, and said to him, 'Going to the cement plant after a

while?' and witness answered, 'Yes, sir.' " This witness was also permitted to testify that Amos Clem told him this on the Saturday following the murder, in Samuels' store. The bill shows that appellant had not impeached Amos Clem by any witness as to any statement that Clem had ever made in court or out of court, and that he had laid no predicate for any hearsay statements out of court, and had not offered any evidence or any statement on the part of the State's witness touching said matters whatever, and that appellant had not shown and had not offered to show that said witness had ever made a statement in court or out of court, as to whether or not he had seen appellant in Dallas upon the afternoon or the night in question. In other words, when Amos Clem testified that he was in Dallas upon said afternoon, and had seen appellant upon such afternoon, and had seen him just before seven o'clock upon said night, and had seen him with other companions at or about a saloon, the appellant then placed the witness' cousin upon the stand and proved by him that the State's witness at about five o'clock in said afternoon was ten miles from Dallas, and was sick, and that after the defendant's witness had gotten water and bathed his head for about an hour or so, that State's witness then went to his home, which was in the same vicinity, about ten miles from Dallas. In other words, the defense proved a complete alibi as to the witness Amos Clem. The State was then permitted to prove all these things by Samuels and what Amos Clem told him and other matters heretofore stated. And Samuels was further permitted to testify: "Do you know how Amos Clem came to be summoned as a witness in this case? A. Yes, sir. Q. How? A. I got him as a witness. Q. You reported him to the county attorney? A. Yes, sir. Q. Did you report the fact to the county attorney? (meaning the fact as claimed by Samuels, that Clem, that is, Amos Clem, had told him, Samuels, on the Saturday immediately following the Saturday night that deceased was killed, and while the said Amos Clem was in Dallas, that he had heard a man say, 'Hello, McCue, where are you going?' and that the man addressed as McCue was Frank McCue, the defendant in this case, and that he made the reply: 'Going to the cement plant after a while'). Q. Did you report the matter to the county attorney? A. Yes, I reported it to Mr. Llewellyn." All these matters were objected to on various grounds, and among others because there had been no impeachment or attempted impeachment. These grounds cover nearly a page and are unnecessary here to repeat. The best that can be said of this testimony for the State is, Amos Clem testified one way about his whereabouts and conditions, etc., on Saturday evening, and the other Clem testified exactly the contrary, and placed him ten miles away from where Amos Clem said he was. This was simply a contradiction of the testimony by one as against the other. It was not impeachment, and it did not authorize the State to introduce the testimony complained of and above mentioned. A more palpable violation of the law could not be well imagined, and it was on crucial points in the case. Appellant's witnesses testified he was at home sick at that time during the whole evening and night. The other witness

testified he saw him on the street in Dallas in contradiction of what McCue's witnesses had stated in their alibi for him. The other Clem put State's witness Amos Clem ten miles away, where it was not pos sible for him to see McCue. There was no impeachment except impliedly by the fact that the defendant was contradicting one Clem by the other Clem. If Amos Clem was telling the truth, witness and McCue were on the street in Dallas near the courthouse stating he was going out to the cement plant after a while. It seems the killing occurred in the direction of the cement plant that night. Now Samuels is permitted to go on the stand and testify to what Amos Clem told him about all these matters, and that he had secured him as a witness for the county attorney. I do not believe any rule of evidence or law can be cited to sustain this ruling of the court. It was not permissible to sustain this witness unless the reputation of that witness was attacked in some respect, and then the sustaining evidence must meet such attack as was made upon it.

Another question is presented of serious moment, and in my judgment is clearly reversible, and in fact demands in the interest of justice that this judgment should have been reversed. Appellant placed the members of his family, his father, mother, sister, etc., upon the witness stand and proved by them an alibi, which covered the entire Saturday and Saturday night, showing that he was sick at home and could not be and was not in Dallas, or at the place of the homicide, and that in fact he was at home sick at the time some distance from where the homicide occurred. It was necessary for the State to meet this testimony. The issue was sharply presented and strongly supported. During the investigation of these witnesses by the State counsel gave them a very rigid cross-examination and sought by every means possible that were in his power as an astute lawyer to break down this testimony and show it to be false. He attacked them on account of being related to him: interested in the case; interested on account of the boy's welfare at the hands of the jury, and all those things were displayed in the cross-examination, intimating through the testimony that these things warped their judgment and their truthfulness beyond the verge into falsehood. It is admitted as a fact that they were strangers in the county and to the jury who tried defendant. To meet this as best they could they offered evidence showing their good character and reputation for truth and veracity. These offered witnesses were men of high character, and were prominent citizens of Dallas County. They would have testified had they been permitted to do so to the high character and veracity and general standing of these witnesses. This testimony was excluded, and a bill of exceptions recites all these matters. I do not deem it necessary to go further into the statement than the above. The matters are clearly, succinctly and forcibly stated in a bill of exceptions, covering every imaginable viewpoint of it necessary for consideration here. Under all the authorities this ruling of the court was wrong. See Phillips v. State, 19 Texas Crim. App., 158; Crook v. State, 27 Texas Crim. App., 198; Tipton v. State, 30 Texas Crim. App., 530;

McGrath v. State, 35 Texas Crim. Rep., 413; Harris v. State, 49 Texas Crim. Rep., 338; Morrison v. Hartford & N. H. Co. (Conn.), 52 Am. Dec., 344. In the case of Jacobs v. State, 42 Texas Crim. Rep., 353, 59 S. W. Rep., 1111, referring to this principle of law, Judge Brooks rendering the opinion of this court, uses this language: "We have also held that where there is a conflict in the testimony and the witness is a stranger his testimony may be supported in the same way." I do not understand how the opinion of the majority was written in view of these authorities. This error was so palpable and clear that it ought not to be the subject of debate, unless all the decisions in Texas bearing on the question are overruled. They were not overruled unless inferentially.

There is another question that I will briefly notice. Among other things, a ground of the motion for new trial set up newly discovered testimony. This came in the form of affidavits, two of which may be mentioned, that by Garvin and the other by Carlton. Garvin, in substance, states that on Saturday night before he heard of the killing of Mabry the following Sunday morning, he went to get his cow which he had staked out on a lot immediately back of the residence of appellant's father, and that in so going to get his cow and returning with her he passed on two sides of the house of appellant's father; that as he was passing same he saw appellant in a hammock on the east side of the house and that at the time he so saw him there it was after sundown, getting dark, and he thinks it was about the hour of seven o'clock. He also says in this affidavit that he knew appellant well and knew the other members of appellant's family. He is positive in his statements and declares in his affidavit that he can not be mistaken. Garvin is shown to be a worthy man, and his high standing is supported by the affidavit of the county clerk of Dallas County. Carlton, then of Dallas, now of Denton, says at the time Mabry was killed he was living in Dallas and one block south of the McCue residence. He states that on the Saturday evening before the killing of Earl Mabry that Saturday night, and about which killing he heard the next morning, he came over from Dallas to his home in Oak Cliff; that after he got off the street car he passed by the McCue residence in going to his home; that at the time he saw no one at the McCue residence; that after remaining at his home for some little time he again started back to Dallas, and in doing so again passed the McCue residence; and he states that at the time he so passed said residence he saw appellant sitting on the porch with his head leaning up against a post of the porch; that he appeared to be sick; that affiant spoke to appellant and that appellant recognized the salutation. Carlton swears that he had known appellant for about fifteen years and was well acquainted with him and was also well acquainted with all the members of his family. That this was after four o'clock in the evening. This testimony was material and would go before the jury from unprejudiced sources. These witnesses were not related to McCue. The other witnesses who testified to the alibi were kinsfolks and closely related. The jury would naturally, as they evi-

dently did from their verdict, look with a degree of suspicion upon the testimony of his family about the alibi, and evidently did not believe it else they would have acquitted instead of convicting. If these witnesses had been before the jury with their testimony it may have balanced the scale in favor of appellant and given him a verdict of. not guilty. The main evidence for the State was a confessed accomplice and murderer with such corroboration as the State could pick up here and there. The testimony for the defendant was an attack on the State's witnesses as best could be done, supported by the testimony of his immediate family on the alibi question. The accomplice was testifying under a contract made in the darkness of a death cell. The McCue family was testifying for the son and brother. Here are two witnesses that are not interested, who testify positively to alibi facts, supporting the McCue family, and they were not interested in McCue or in the result of the case. The rule of cumulative evidence does not apply here. The McCue family did not know that these two witnesses saw the defendant under the circumstances they state. It is true, they testify appellant was at home sick, and one of these affiants would testify from his appearance, when he saw him sitting on the gallery, he thought he was sick, but he was there at home by both witnesses, and they cover from four to seven o'clock or later on in the evening at the very time that State's witnesses were placing him in Dallas preparing for the fatal tragedy. This should not be regarded as cumulative to the relatives who testified to the alibi. The same rule applies in applications for continuance. We have not applied the rule of cumulative evidence where the wife or husband or some close relative testifies to facts and a continuance is sought to prove by disinterested witnesses the same facts. This is a rule necessary to the ends of justice and right, because we are aware, as all humanity ought to be, that jurors do not regard with the same favor the testimony of a wife or near relative as they do the testimony of those who are not so related or interested.

I am aware that there is no particular service to be performed by a dissenting opinion, but the opinion is so far removed from what I conceive to be the law that I feel impelled to dissent; at least not be placed in the attitude of approving what was written. There are many cases where I have not entered my dissent that I have not approved, but in this particular case, and in some others, the matters are of such importance that I do not feel justified in my own conscience that I should let the opinion go unchallenged. I do this without intending any reflection on my brethren, except I can not agree to what they have stated to be the law. I do not believe the conviction of this boy ought to stand! I do not believe under this record he ought to be in the penitentiary! These legal errors, to my mind, are palpable, hardly needing authorities to show the *errors* much less authorities to sustain the views that I enter in this dissent. The statements of the bills of exception ought to carry conviction without reasoning or authority.

I therefore most respectfully enter my dissent, and think appellant

ought to have had a new trial, and that this conviction has been wrongfully affirmed.